PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 21-3340
_____

UNITED STATES OF AMERICA

v.

EVANS SAMUEL SANTOS DIAZ,

                                        Appellant
_____

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(D.C. Crim. No. 3:16-CR-0085-006)
Honorable Malachy E. Mannion, United States District Judge
_____

Argued October 19, 2022

_____

BEFORE:  GREENAWAY, JR., MATEY, and ROTH,
*Circuit Judges.*

(Filed: April 26, 2023)
_____

OPINION OF THE COURT
_____

Heidi R. Freese
Federal Public Defender, Middle District of Pennsylvania
Frederick W. Ulrich [ARGUED]
Assistant Federal Public Defender
Tammy L. Taylor
Staff Attorney
100 Chestnut Street, Suite 306
Harrisburg, PA 17101

*Counsel for Appellant*


John C. Gurganus
United States Attorney, Middle District of Pennsylvania
Sean Camoni [ARGUED]
Assistant United States Attorney
309 Federal Building
Scranton, PA 18501

*Counsel for Appellees*

GREENAWAY, JR., *Circuit Judge*.

Appellant Evans Samuel Santos Diaz (Santos Diaz or Appellant) challenges the District Court's imposition of a no-contact order prohibiting contact between him and his fiancée, Ms. Amanda Fernandez (Fernandez). This no-contact order was imposed during Santos Diaz's two-year incarceration

period and during his second two-year supervised release term. He argues that (a) the District Court lacked authority to impose this no-contact order during his incarceration and (b) that the no-contact order was not narrowly tailored, impinging on his First Amendment right to free speech. He requests that this Court vacate the no-contact order as it relates to both his term of incarceration and supervised release period.

The District Court overruled all of Appellant's objections to the no-contact order and denied his Motion to Correct Sentence on the same basis. We will vacate and remand the no-contact order affecting Appellant's incarceration term and affirm the no-contact order as a condition of his second period of supervised release.

## I. Background[1]

---

[1] On November 17, 2022, the Government filed a letter pursuant to Rule 28(j) and described that a grand jury returned an Indictment charging Appellant with Tampering with a Witness, Corrupt Persuasion in violation of 18 U.S.C. § 1512(b) (Count One), Subornation of Perjury, in violation of 18 U.S.C. § 1622 (Count Two), and Criminal Contempt of Court, in violation of 18 U.S.C. § 401(3). The Government describes that Amanda Fernandez would be a potential witness in the new case with these charges. Appellant responded that we should not consider this new evidence because a court cannot consider new evidence or arguments under Rule 28(j) and that the new judge presiding at Appellant's initial appearance can decide the appropriateness of any pre-trial conditions. We agree. We cannot consider new evidence or arguments under Rule 28(j). *See Beazer East, Inc. v. Mead Corp.*, 525 F.3d 255, 264 (3d Cir. 2008) (describing that under

Santos Diaz was convicted of Conspiracy to Distribute and Possess With Intent to Distribute Heroin and Cocaine, in violation of 21 U.S.C. § 846. He was sentenced to 33 months' incarceration followed by 36 months' supervised release. Appellant commenced his 36 months' release on September 30, 2020. During that period of supervised release, on September 19, 2021, Scranton Police Officers responded to a report of a physical, domestic incident involving his then girlfriend, Fernandez. This was in addition to other violations of supervised release (possessing and using marijuana). As a result of these potential violations, the Probation Office submitted a Petition for a Warrant of Arrest for Appellant.

On September 27, 2021, Santos Diaz appeared before Magistrate Judge Joseph F. Saporito, Jr. for a probable cause and detention hearing. Magistrate Judge Saporito released Santos Diaz, pending final revocation hearing, after hearing testimony from Fernandez that she was not scared of him and was planning to stay away from him. Magistrate Judge Saporito imposed a no-contact condition that restricted Santos

normal circumstances parties cannot present additional arguments styled in Rule 28(j) letters); *DiBella v. Hopkins*, 403 F.3d 102, 118 (2d Cir. 2005) (stating that Rule 28(j) could not be used to submit new evidence to an appeals court) (citations omitted); *Trans-Sterling, Inc. v. Bible*, 804 F.2d 525, 528 (9th Cir. 1986) (describing that Rule 28(j) cannot act as a "back door" for new evidence not contained in the record). Regardless, the sentencing judge did not have the benefit of this new Indictment when deciding whether to impose the no-contact order at issue in this appeal.

Diaz's ability to have any contact with Fernandez during this time, pending a final revocation hearing in front of the District Judge. The facts Fernandez testified to in the Detention hearing were proven false, as discussed in greater depth below.

Upon discovering that Fernandez's testimony was false, the Government filed an Unopposed Motion for Stay and a Motion for Reconsideration of Magistrate Judge Saporito's Order Granting Release. Magistrate Judge Saporito ordered Appellant to be detained until his final revocation hearing in front of District Judge Mannion.

At the final supervised release violation hearing, Judge Mannion sentenced Appellant to the statutory maximum of 24 months' incarceration followed by another two years' supervised release. He noted that Santos Diaz had pleaded guilty to Disorderly Conduct instead of more serious domestic assault charges, but reimposed Magistrate Judge Saporito's no-contact order. At this point, Santos Diaz notified Judge Mannion that he and Fernandez were engaged. Judge Mannion reiterated that they could not have any contact while he was incarcerated or during his new term of supervised release.

Santos Diaz moved to correct his sentence under Federal Rule of Criminal Procedure 35(a), requesting that the District Court correct its sentence to not restrict his ability to contact any person while he is incarcerated.[2] The District Court denied this motion, and this appeal followed.

---

[2] For purposes of this appeal, Santos Diaz contests the no-contact order both while he is incarcerated and subsequently while he is on supervised release.

a.     Events Surrounding Domestic Incident on September 19, 2021

According to the Petition for a Warrant of Arrest, Fernandez called the police and reported that she had received bruises from a male, whom Fernandez did not identify by name at that time, inside the dwelling.  He was later identified as Santos Diaz.  She reported that Appellant had struck her in the face with an electronic tablet and choked her until she almost lost consciousness.  Appellant took a video of Fernandez weeping and dialing 911.  Appellant posted this video on his Facebook page.  The video displayed Fernandez crying while Santos Diaz was snickering and laughing at her in the background.

i.*Fernandez's False Testimony at the Detention and Probable Cause Hearing on September 27, 2021*

The detention and probable cause hearing took place in front of Magistrate Judge Saporito.  Fernandez testified via phone at this hearing.  Specifically, she testified that she did not remember telling the officers on September 19 that Santos Diaz assaulted her in the past.  She stated that she remembered nothing because she was suffering from a panic attack.  She did not remember showing the Facebook video to the police depicting Santos Diaz filming Fernandez crying on the floor.  She testified that she had no intention of living with Santos Diaz again and that their relationship had terminated.  She also noted that she would report to the District Court or the Probation Officer if she were ever approached by Appellant again.  When the District Court asked about whether Fernandez would have fears or concerns if the Court restricted personal association with Santos Diaz, she replied an unequivocal— "no."

She stated that she would comply "a hundred percent" if the Magistrate Judge imposed a no-contact order. Yet, she admitted that she answered Appellant's phone call when he was held in custody for the domestic assault charges. She was unaware of whether Santos Diaz was told at his arraignment that he was prohibited from having any contact with her. She recounted that she did not feel threatened by his phone call, and confirmed that he did not ask her to drop the domestic assault charges.

ii. *Santos Diaz asked Fernandez to Falsely Testify at the Detention and Probable Cause Hearing*

After the Detention and Probable Cause hearing, the Government obtained recordings of prison phone calls from Lackawanna County Prison, where Santos Diaz was being held. The recordings reveal that not only did Santos Diaz contact Fernandez—even though he was likely prohibited from doing so because she was the victim in his state court case—but he also violated the Magistrate Judge's no-contact order on the same day. Santos Diaz called Fernandez mere hours after the no-contact condition was entered.

In fact, Santos Diaz made a series of phone calls to Fernandez before the Detention and Probable Cause hearing. He called on September 20, 2021, the day after he was arrested. He understood that he might have been prohibited from contacting Fernandez but called her anyway. He directed her to call various judges' chambers (state and federal) and request that no charges be pursued. Santos Diaz made another call on September 21, 2021. During this phone call, Fernandez referenced physical abuse by Appellant but stated her desire for them to be together. A third phone call occurred on September 22, 2021. During this twenty-minute phone call,

7

Appellant told Fernandez that if she loved him, she would listen to him and recant any statements she made to the police about the domestic abuse incident. They discussed destroying the cell phone used to videotape Fernandez on the night of September 19, 2021.

Santos Diaz continued to make phone calls *after* the Detention and Probable Cause hearing, when the no-contact order was explicitly imposed in federal court. He made the first phone call at 7:00 p.m. on September 27, hours after the hearing. Santos Diaz made other phone calls to Fernandez mainly from other inmates' accounts. During these calls, Fernandez was instructed to recant her statement and persuade her mother not to get involved. Fernandez did not report her contact with Santos Diaz to Probation or the District Court as he had instructed her.

On October 5, 2021, Fernandez submitted a letter to the District Court. Fernandez requested that all charges against Santos Diaz be dismissed. She said that she acted without influence from Santos Diaz and was not intimidated by him. She demanded the District Court dismiss any contact restrictions between Santos Diaz and her because she thought they could reconcile.

b. District Court Judge Mannion's Rulings
i.*Final Supervised Release Violation Hearing*

Santos Diaz appeared for his final supervised release violation hearing in front of Judge Mannion on December 6, 2021. Santos Diaz was sentenced to the statutory maximum of 24 months followed by 2 years' supervised release. Judge Mannion recounted that there were many violations: the September 19 domestic incident that resolved with a

8

Disorderly Conduct plea in the Court of Common Pleas of Lackawanna County, testing positive for marijuana several times, and failing to schedule and appear at substance abuse sessions. In fashioning Appellant's sentence, Judge Mannion focused on Santos Diaz's breach of trust with the District Court. Judge Mannion reviewed the video footage and recorded phone calls from Santos Diaz to Fernandez.

Judge Mannion emphasized that his sentence was unrelated to the Disorderly Conduct plea in state court. He relied on Appellant's criminal history and his violations only one year into his supervised release period, finding that an appropriate sentence would act as a deterrent and protect the community from his activities. Judge Mannion re-imposed the no-contact order. Santos Diaz could not contact Fernandez while he was incarcerated or while he was on his second period of supervised release. Appellant stated that they were engaged. He did not understand how they could not speak.

ii. Motion to Correct Sentence

After Santos Diaz was sentenced, he moved to correct his sentence under Federal Rules of Criminal Procedure 35(a). He argued that the District Court could not restrict his ability to contact anyone when imprisoned because any authority about these matters was left to the Federal Bureau of Prisons (BOP).

The District Court denied the Motion to Correct Sentence. Judge Mannion ruled that the Court had inherent authority to impose a post-trial no-contact order even though neither the Third Circuit nor the Supreme Court of the United States had considered this issue. Applying reasoning from the Ninth and Seventh Circuits, Judge Mannion held that there was

9

no clear error in imposing such an order because it was necessary to the administration of justice (protecting Fernandez as a victim and halting witness tampering). He denied Appellant's argument that the District Court did not follow certain procedures when exercising this inherent authority.

## II. Discussion[3]

Appellant makes three arguments relevant to this issue on appeal. First, he argues that Congress's statutory scheme forecloses the District Court's ability to impose a no-contact order as a part of a term of incarceration. Second, he argues that the District Court erred in imposing a no-contact order during his incarceration period because it lacked the inherent authority to do so, and even if it had authority, it did not adhere to an appropriate process. Third, he argues that the District Court abused its discretion in imposing a no-contact order during his supervised release. While we see no abuse of discretion in the District Court's order concerning the terms of supervised release, we hold the District Court lacked either statutory or inherent authority to impose the custodial no-contact order. We address each argument in turn below.

### A.     No-contact Order as Part of Incarceration

---

[3] The District Court had subject-matter jurisdiction under 18 U.S.C. § 3231. This Court has appellate jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

10

a.      Statutory Authority

An appellate court reviews sentences imposed for violating probation or supervised release for reasonableness. *United States v. Ali*, 508 F.3d 136, 142 (3d Cir. 2007). Whether a district court can impose a specific sentence, such as a no-contact order, is a legal issue and is reviewed *de novo*. *United States v. A.M.*, 927 F.3d 718, 720 (3d Cir. 2019).

Congress created district courts and defined their judicial power as found in the U.S. Constitution. *United States v. Union Pac. R.R. Co.*, 98 U.S. 569 (1878). A trial court judge cannot impose a sentence that is not authorized by statute. *In re Bonner*, 151 U.S. 242, 256–58 (1894). Congress has delegated the authority over incarcerated individuals to the BOP, as dictated by the passage of the Sentencing Reform Act of 1984. *E.g.*, 18 U.S.C. §§ 3621–34 (2018). The BOP, under the Attorney General, is tasked with managing and regulating all federal prison facilities. 18 U.S.C. § 4042(a)(1) (2018).

In a limited set of circumstances, a court may restrict an individual's communication while he or she is incarcerated. 18 U.S.C. § 3582(e) (2018).[4] This limited exception allows a

---

[4] The text of this statute reads: "The court, in imposing a sentence to a term of imprisonment upon a defendant convicted of a felony set forth in chapter 95 (racketeering) or 96 (racketeer influenced and corrupt organizations) of this title or in the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. § 801 et seq.), or at any time thereafter upon motion by the Director of the Bureau of Prisons or a United States attorney, *may include as a part of the sentence an order that requires that the defendant not associate or communicate with a specified person, other than his attorney, upon a*

court to restrict an inmate's communication while incarcerated where the individual communicates to participate in an unlawful enterprise. *Id.* This restriction only applies to inmates convicted of racketeering-influenced and corrupt-organizations offenses, racketeering itself, or drug felonies. *Id.*

Alternatively, a district court has the statutory authority to enter a temporary restraining order (TRO) to protect a witness or victim. 18 U.S.C. § 1514(a)(1). Under this statute, the government must move for a TRO and a district court may grant one without written or oral notice to the adverse party. *Id.* at § 1514(a)(2). A district court can either *sua sponte* or upon motion by the government issue a protective order to halt harassment of a victim or witness in a federal criminal case or investigation. *Id.* at § 1514(b)(1). A hearing must be held to issue a protective order if no exigent circumstances can be shown. *Id.* at § 1514(b)(2).

Where there is no binding authority, a court must look towards the text of the statute for specific guidance. *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002); *Zimmerman v. Norfolk S. Corp.*, 706 F.3d 170, 177 (3d Cir. 2013). The structure of the section of the statute as well as the design of the statute can help discern the meaning of the statute. *United States v. Thornhill*, 759 F.3d 299, 308 (3d Cir. 2014) (discussing statutory interpretation of supervised release revocation under 18 U.S.C. § 3583(g) and the Sentencing Reform Act). "[O]nly if 'the ordinary meaning of a statute and

---

*showing of probable cause to believe that association or communication with such person is for the purpose of enabling the defendant to control, manage, direct, finance, or otherwise participate in an illegal enterprise.*" (emphasis added).

12

the statute's legislative history fail to provide sufficient guidance to a term's meaning'" can "[w]e 'look to other statutes pertaining to the same subject matter which contain similar terms.'" *FTC v. Shire Viropharma Inc.*, 917 F.3d 147, 158 (3d Cir. 2019) (quoting *Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 171 F.3d 818, 823 (3d Cir. 1999)).

Here, there is no statutory authority for a no-contact order during confinement. As different parts of the Sentencing Reform Act of 1984 are codified, we look at the two most relevant statutes, both of which are cited by Appellant. Beginning with the text, a review of 18 U.S.C. § 3621 suggests that a district court has no statutory authority to impose a no-contact order as part of an incarceration sentence. The various sub-provisions require the BOP, and not the courts, to designate a prisoner's facility, 18 U.S.C. § 3621(b), implement substance abuse treatment, *Id.* at § 3621(e), or offer other services such as sex offender programs. *Id.* at § 3621(f).

Similarly, 18 U.S.C. § 4042, the statute governing the duties of the BOP, contains analogous mandatory language as in 18 U.S.C. § 3621. It begins with the phrase that the BOP "under the direction of the Attorney General, *shall* . . . ." 18 U.S.C. § 4042 (a)(emphasis added). Shall "express[es] what is mandatory" or "used to express a command." *Shall*, Merriam-Webster Abridged, https://www.merriam-webster.com/dictionary/shall (last visited March 31, 2023). Included in this mandate is a broad authority over all federal penal and correctional institutions. 18 U.S.C. § 4042(a)(1). The BOP has executed this Congressional authority by enacting different regulations governing its oversight of incarcerated individuals. For example, there is a regulation outlining when a warden can restrict a prisoner's communication and what process must be executed for this to

13

occur.  *See* 28 C.F.R. § 540.15 (2018).  Looking at the two statutes separately and together, Congress intended for the BOP to control conditions of confinement of all incarcerated individuals.

Besides, a court must find that "such an order is necessary to prevent and restrain an offense under section 1512. . . or under section 1513 of this title."  18 U.S.C. § 1514(a)(1).  The District Court did not find, and the Appellee did not prove, that Santos Diaz would be convicted of any offenses under 18 U.S.C. § 1512 or § 1513.  No court has applied this statute in a similar context or used its authority under this statute to impose a no-contact order.

The other avenue to establish statutory authority is the exception in 18 U.S.C. § 3582(e).  It does not apply here.  According to the plain text of the statute, a sentencing court can impose a communication restriction upon a motion by the Director of the BOP or a United States Attorney.  18 U.S.C. § 3582(e).  A trial court cannot invoke this statutory authority on its own accord.  *See United States v. Allmon*, 702 F.3d 1034, 1037 (8th Cir. 2012).  This fact points to congressional intent to provide exclusive authority to the BOP—a court generally cannot *sua sponte* impose a communication restriction.  Because no motion was made and the District Court did not invoke the authority in § 3582(e), the District Court did not have statutory authority to impose a no-contact order during Santos Diaz's incarceration period.

b.      Inherent Authority

Federal courts have certain powers that are not created by statute yet are necessary by virtue of having to manage their dockets and ensuring cases are disposed of properly.

14

*Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (citation omitted). There are a limited set of circumstances in which the Supreme Court of the United States has recognized the exercise of this vague authority. *Id.* For example, a court can discipline attorneys, *id.* (citing *Ex parte Burr*, 9 Wheat 529, 531 (1824)), can vacate its own judgment if it was the result of a fraud perpetrated on it, *id.* at 44, and can bar a defendant if he or she is disruptive. *Id.* A court can also act on its own and act where a case is not prosecuted. *Id.* at 44. A court can certainly impose sanctions "for conduct which abuses the judicial process." *Id.* at 45. Relatedly, it is well established that "[a] trial judge indisputably has broad powers to ensure the orderly and expeditious progress of trial." *Bitter v. United States*, 389 U.S. 15, 16 (1967). This includes a judge's power to revoke bail. *Id.*

Recognizing that it has not defined the parameters of such inherent authority, the Supreme Court of the United States has articulated limitations of this power in the civil context. *Dietz v. Bouldin*, 579 U.S. 40, 45 (2016) (discussing inherent authority in relation to recalling a civil jury and amending a verdict). The Court espoused two key principles in this respect. *Id.* First, it is essential for an action employed under inherent authority to be a "'reasonable response to the problems and needs confronting the court's fair administration of justice." *Id.* (quoting *Degen v. United States*, 517 U.S. 820, 823–24 (1996)). Second, utilizing inherent authority "cannot be contrary to any express grant of or limitation on the district court's power contained in a rule or statute." *Id.* at 46. We have only applied these two requirements in the context of forbidding a re-trial and dismissing an indictment. *United States v. Wright*, 913 F.3d 364, 371–75 (3d Cir. 2019) (holding that the district court abused its discretion in barring a re-trial

15

and dismissing an indictment under its inherent authority).  But neither we, nor the Supreme Court, have ever found inherent authority to add terms and conditions to a criminal sentence.

The Government argues that we should follow an approach developed in a pair of cases from the Ninth and Seventh Circuits.  In *Wheeler v. United States*, the Ninth Circuit held that a district court has inherent authority to impose a no-contact order after trial to protect a witness.  640 F.2d 1116, 1123 (9th Cir. 1981).  There a defendant attempted to persuade a witness to testify on his behalf.  *Id.* at 1118.  He contacted her family and others in this pursuit.  *Id.*  He continued this behavior from prison after trial concluded and he was convicted.  *Id.*  As a result, the witness sought a protection order from the court, which it granted.  *Id.*  The order prohibited defendant from contacting ten individuals, including the witness's family and commanding military officers.  *Id.*  The order essentially restricted defendant's mailing privileges while incarcerated to prevent this communication.  *Id.*  Defendant was not notified of the protection order and was first notified four years after it was issued.  *Id.*

Defendant unsuccessfully challenged the district court's order restricting his mail privileges.  *Id.* at 1123.  First, he claimed that the no-contact order was invalid because it was levied after trial, and a district court's power to protect witnesses was limited to before or during trial.  *Id.*  Second, he argued that the district court exceeded its authority and interfered with the executive branch's domain of prison administration.  *Id.*

The Ninth Circuit rejected both arguments.  In rejecting the first argument, the court found that by protecting witnesses

after a trial, "the court is encouraging that witness, and other potential witnesses, to come forward and provide information helpful to the implementation of justice." *Id*. This extended to general witnesses outside of the specific case. *Id.* at 1123–24 (comparing protecting witnesses to the protection of jurors even though trial was over). Protection of witnesses allowed for no-contact orders even where trial or proceedings had already ended.[5] *Id.* In finding this, the Ninth Circuit substituted "administration of justice" for "progress or order of the trial" as originally described in *Bitter*. *Id.* at 1124 n.15. The court reasoned that the uncommonness of post-trial witness orders coupled with the need to maintain the independence of future witnesses justified the shift to this framing. *Id.* The no-contact order was not only about the witness in this specific case but about encouraging other potential witnesses to provide information that played a role in achieving justice. *Id.* at 1123–24. Furthermore, the court held that the district court did not interfere with the executive branch's domain of prison administration. *Id.* at 1125. There was no infringement of fundamental constitutional rights. *Id.* The district court's order restricting defendant's mail-in privileges because of the no-contact order should deserve deference like a prison regulation. *Id.*

The Seventh Circuit has held that a district court has inherent authority to enact no-contact orders to protect victims and prevent "reluctant witness[es]." *United States v. Morris*,

---

[5] The Ninth Circuit remanded on this issue. It found that for the no-contact order to be valid, it needed to survive a two-part test developed in another Ninth Circuit case. *Wheeler*, 640 F.2d at 1124 (citing *United States v. Sherman*, 581 F.2d 1358 (9th Cir. 1978)).

259 F.3d 894, 901 (7th Cir. 2001). In *Morris*, defendant pleaded guilty to two counts of Traveling Across State Lines to Engage in a Sexual Act with a Juvenile, in violation of 18 U.S.C. § 2423(b). *Id.* at 896. At sentencing, the district court heard testimony that defendant continued contacting the child victim while defendant was still incarcerated. *Id.* at 897. He called her house, wrote her letters, and asked friends to relay messages. *Id.* The victim and her family did not want to be contacted by defendant but did not specifically ask for a no-contact order. *Id.* The district court imposed a no-contact order that required defendant to avoid all contact with the victim and her family while defendant was in prison. *Id.*

Relying on the Ninth Circuit's analysis, the Seventh Circuit affirmed the district court's no-contact order while defendant was incarcerated. *Id.* at 901. Defendant unsuccessfully challenged the no-contact order on the same grounds as the appellant in *Wheeler*. *Id.* at 900. Defendant contended that the district court lacked any type of authority to impose the no-contact order. *Id.* The appellate court rejected this argument. *Id.* It found that the victim may testify at a future trial because defendant was trying to withdraw his guilty plea, putting the situation in a pre-trial context as opposed to the post-trial context *Wheeler* had considered. *Id.* at 901. Defendant harmed the victim by directly and indirectly contacting her. *Id.* Importantly, the no-contact order's goal was not to punish defendant, but to protect the victim and her family. *Id.* The protection of administration of justice warranted the use of such order under a court's inherent authority even though such orders should be used sparingly. *Id.*; *but see United States v. Molina*, 985 F.2d 576, 576 (9th Cir. 1993) (Table Op.) (no inherent authority to restrict appellant's communication with victim of a crime during

incarceration but the BOP could treat the order as a recommendation). The court indeed did not "limit courts in the exercise of their inherent authority to the protection just of witnesses who plan to testify," Dissent Op. 5, but it presumably did not do so because that specific situation, the one which we have here, was not presented to the court and there was no occasion to address it.

Here, there is not sufficient support for the exercise of inherent authority to impose a no-contact order during Santos Diaz's incarceration term. We decline to follow *Wheeler*'s reasoning. The notion of "administration of justice," as developed in *Wheeler*, does not impose any parameters on the exercise of inherent authority. The cases the Ninth Circuit relied on did not contain this language for a post-trial exercise of inherent authority. *Wheeler*, 640 F.2d at 1123. The Ninth Circuit itself has dictated in which situations "administration of justice" is sufficient to justify the exercise of inherent authority. *Id.* The inexactitude and breadth of this concept dictates that district courts be disallowed from impeding the authority of the BOP.[6]

---

[6] An example to illustrate how this concept can be used by district courts to dictate outcomes that are explicitly not allowed. Suppose a sentencing judge labels a defendant as a miscreant. As a result of that, the sentencing judge orders that this defendant cannot be held among other incarcerated individuals simply because of this label because it impedes the administration of justice. It is evident that a sentencing judge cannot use his or her authority to reach such a result. Yet, relying on the logic espoused by *Wheeler* and *Morris* would allow such a result based on inherent authority. We cite no cases supporting our example because courts seldom rely on

19

Particularly, there is nothing to suggest that inherent authority as a concept should be used to justify corrective measures[7] after trial—such as no-contact conditions during incarceration.[8] The *Chambers* Court discussed and applied inherent authority in the civil, not the criminal, context. 501 U.S. at 50–51. The Court in *Bitter* discussed inherent authority in a criminal context, but its analysis was limited to the progress of trial. 389 U.S. at 16. As such, there are no facts here showing that the exercise of inherent authority was required to continue the operations of the court. The no-contact order did not implicate the administration and safety of jurors as was required during the on-going COVID-19

inherent authority as it is a rare exercise of authority. We agree that courts cannot impose punishment not authorized by statute, but inherent authority could allow a court to do just that, serving as an unfettered source of a power.

[7] The Dissent incorrectly argues that we read the no-contact order to punish Santos Diaz instead of reading it to protect Fernandez from harassment. We explain in Part A(b) of this opinion that the same logic of protecting a victim from harassment, built on *Wheeler* and *Morris*, is not applicable here.

[8] Indeed, courts have appropriately resisted the use of inherent authority to add restrictions to criminal defendants. *See, e.g.*, *United States v. Zangari*, 677 F. 3d 86, 92 (2d Cir. 2012) (rejecting inherent power to order restitution); *United States v. Blackwell*, 81 F.3d 945, 949 (10th Cir. 1996) (rejecting inherent power to resentence defendants); *United States v. Fahm*, 13 F.3d 447, 453–54 (1st Cir. 1994) (same); *United States v. Lewis*, 862 F.2d 748, 750 (9th 1988) (same).

pandemic nor did it implicate a defendant being tardy in returning to trial, as was the case in *Bitter*, 389 U.S. at 16.

There are no principles set forth that would allow us to conclude that the substitution of "administration of justice" is appropriate and even if it is, that it would allow the kind of disposition that occurred here. If such an exercise of inherent authority were allowed, a district court could use the justification of "administration of justice" to impose many different types of punishment that are not provided for by federal statute. A district court does not have unfettered discretion in preventing the administration of justice, particularly in situations where the statutes delegate specific authority to the BOP.[9] Allowing a court to change a defendant's terms of incarceration under the guise of inherent

---

[9] The Dissent's reliance on *United States v. Ward*, 131 F.3d 335 (3d Cir. 1997) provides no support for its argument that we *support* the exercise of inherent authority in circumstances such as those presented here. In *Ward*, we reviewed whether a court's imposition of an order requiring a criminal defendant to undergo blood testing for AIDS when a defendant was convicted of sexual assault offenses was an appropriate exercise of the court's power. 131 F.3d at 337. We recounted that the district court there based its order on inherent authority, for the same reason that the Dissent suggests here, "to shield the criminal justice system from abuses, oppression, and injustice, and to protect witnesses." *Id.* (cleaned up). The Dissent fails to recognize that we declined to adhere to "the district court's reliance on inherent authority" and instead based our affirmance on a statutory basis grounded in the Violence Against Women Act. *Id.* We did not comment on the parameters of inherent authority there but do so here.

authority does exactly what the Dissent argues it does not: "explicitly defy a rule, statute, or constitutional provision." Dissent Op. 6.

Nor are we persuaded by the reasoning of the Seventh Circuit, as the Dissent suggests. The facts here are distinguishable from *Morris*. That case transformed into a pretrial posture because defendant moved to withdraw his guilty plea and the sentencing court was considering granting that motion. *Morris*, 259 F.3d at 901. Any contact between defendant and victim would then impede her ability to potentially testify in a future trial. *Id.* Conversely, here, the proceedings were completed when Santos Diaz appeared in the District Court for revocation of his supervised release. The District Court explicitly recognized that the underlying state charges were resolved with a Disorderly Conduct plea in the Court of Common Pleas of Lackawanna County, testing positive for marijuana several times, and failing to schedule and appear at substance abuse sessions. *Id.* There was no longer a risk of Santos Diaz unduly influencing Fernandez to be a "reluctant witness," *Morris*, 259 F.3d at 901, because there were no future proceedings where Fernandez would be called to testify. To state it explicitly: Fernandez was not called into a subsequent proceeding the way the victim in *Morris* was going to be to testify because the underlying state court proceedings were finished. In such a case where Fernandez would be called to testify, the court there could separately impose a no-contact order under the pre-trial posture.

Lastly, we note that a District Court has the authority to make recommendations to the BOP about Santos Diaz's conditions of confinement. *See* 18 U.S.C. 3582(a); 18 U.S.C. § 3621(b); *Tapia v. United States*, 564 U.S. 319, 331 (2011) ("A sentencing court can *recommend* that the BOP place an

22

offender in a particular facility or program."); *Molina*, 985 F.2d at 576 (construing no-contact order during incarceration as a recommendation to the BOP); *United States v. Sotelo*, 94 F.3d 1037, 1041 (7th Cir. 1996) ("Although the district court did not have the authority to impose the blanket communication restriction at issue in this case, the court certainly had the option to recommend that the [BOP] impose such a restriction."). While there is no basis to invoke the District Court's inherent authority on these facts, we leave to the District Court on remand whether to recommend such a communication restriction to the BOP.

## B. <u>No-contact Order during Supervised Release</u>

We review challenges to special conditions of supervised release for abuse of discretion. *United States v. Wilson*, 707 F.3d 412, 416 (3d Cir. 2013).

Congress has delegated the authority to impose conditions of supervised release to the federal courts. *See* 18 U.S.C. § 3583. Relevant here, a district judge may impose a special condition of supervised release where the condition meets three elements. *Id.* at § 3583(d). First, the condition must be "reasonabl[y] related to the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), and (a)(2)(D)." *Id.* Second, the condition must not "involve[]. . . greater deprivation of liberty than is reasonably necessary for the purposes set forth in section 3553(a)(2)(B), (a)(2)(C), and (a)(2)(D)." *Id.* Lastly, any condition must be "consistent with any pertinent policy statements issued by the Sentencing Commission pursuant to 28 U.S.C. 994(a)." *Id.* The plain text of this statute provides authority for a district judge to impose special conditions— such as the one here—during one's period of supervision. *See United States v. Voelker*, 489 F.3d 139, 143 (3d Cir. 2007);

23

*Sotelo*, 94 F.3d at 1040 n.2 ("A district court does have the authority to impose a communication restriction as a condition of supervised release, regardless of the offense of conviction." (cleaned up)).

Here, it is indisputable that the District Court had statutory authority under 18 U.S.C. § 3583(d) to impose such a special condition during Santos Diaz's second term of supervision. We need not belabor this point as Appellant conceded at Oral Argument that Congress legislated in this area and his only objection to the condition as it relates to his supervision is that it allegedly violates his First Amendment rights. As discussed below, the special condition was sufficiently connected to the 18 U.S.C. § 3553(a) factors and satisfies the test laid out by this Circuit.

## C. No-Contact Order during Supervised Release is Narrowly Tailored

In addition to adhering to the parameters outlined in 18 U.S.C. § 3583(d), as discussed prior, "[c]onditions of supervised release must be supported by some evidence that the condition imposed is tangibly related to the circumstances of the offense, the history of the defendant, the need for general deterrence, or similar concerns." *Voelker*, 489 F.3d at 144 (citing *United States v. Pruden*, 398 F.3d 241, 248–49 (3d Cir. 2005)). While a district court is required to put forward factual findings justifying special conditions, an appellate court may affirm a special condition if there is any "viable basis" for the condition in the record. *Id.* (quoting *United States v. Warren*, 186 F.3d 358, 367 (3d Cir. 1999)).

Supervised release conditions can be "substantially beyond the ordinary restrictions imposed by law on an

24

individual citizen." *Morrissey v. Brewer*, 408 U.S. 471, 478 (1972). Even special conditions that restrict constitutional rights may be upheld if they meet certain requirements. *United States v. Crandon*, 173 F.3d 122, 128 (3d Cir. 1999). They will be upheld if (1) they are directly related to deterring defendant and protecting the public and (2) are narrowly tailored. *Id.*; *see, e.g.*, *United States v. Bortels*, 962 F.2d 558 (6th Cir. 1992) (upholding supervised release condition that restricted individual associating with fiancée because the individual endangered the community by getting involved in a high-speed chase to prevent fiancée from getting arrested).

The District Court did not abuse its discretion in imposing a no-contact special condition as part of Appellant's two-year supervised release period. The District Court found, and the record shows, that sufficient evidence connects this special condition to the 18 U.S.C. § 3553(a) factors.

The no-contact order prohibited Appellant from directly or indirectly contacting Fernandez for his two-year supervised release period. It was first imposed by the Magistrate Judge at the Probable Cause and Detention hearing. Hours after the hearing, Appellant placed at least one call to Fernandez despite the no-contact order. [10] This tracked Appellant's history and characteristics of not complying with both federal and state

---

[10] The record is unclear on how many times Santos Diaz called Fernandez after the Probable Cause and Detention hearing. Judge Mannion recounted that Appellant made four calls. Appellant contends that this was a factual error and there was only one call. Even so, the number of calls does not matter because Appellant placed at least one call to Fernandez after being ordered not to contact her at all.

25

court orders. The condition here prevented Appellant from obstructing justice and decreased "the possibility of creating a reluctant or tampered witness in future cases." App. 71.

Although the Government did not argue this at the District Court level or on the appeal, there are enough facts to show that this special condition relates to deterrence and protection of the public. *United States v. Holena*, 906 F.3d 288, 291 (3d Cir. 2018) ("Special conditions may not deprive the defendant of more liberty 'than is reasonably necessary' to deter crime, protect the public, and rehabilitate the defendant." (citing 18 U.S.C. § 3583(d)(2))). The no-contact special condition addressed the circumstances underlying Appellant's violation. Although the District Court noted that the sentence itself was unrelated to the state charge, it was related to Appellant's history and characteristics of repeatedly violating parole and not adhering to any court's rules (state or federal). The Magistrate Judge was concerned with the physical protection of Fernandez in imposing this condition. There was a concern for Fernandez and how she may be dissuaded from coming forward as a victim of domestic abuse, as she was being contacted by Appellant even when he was incarcerated. *Id.* This is enough to affirm the special condition. *See, e.g.*, *United States v. Wilkins*, 909 F.3d 915 (8th Cir. 2018) (upholding special condition prohibiting defendant from contacting his wife because defendant assaulted her); *Bortels*, 962 F.2d at 560 (affirming district court's special condition preventing appellant from communicating with her fiancé because it aided in the rehabilitation of appellant and protected the public).

Nor does Appellant have a valid First Amendment claim. He implicitly argues that because the no-contact order is not narrowly tailored, it burdens his fundamental rights

26

under the First Amendment. Mainly, Appellant relies on this Court's published decision in *Holena*, 906 F.3d at 288. In *Holena*, we held that special conditions restricting a defendant's use of a computer and the internet were more restrictive than necessary and thus limited First Amendment activity unrelated to defendant's crime. 906 F.3d at 294. This condition was broader in scope and restricted much more speech conduct. *Id.* While *Holena* is instructive in terms of having special conditions that are narrowly tailored, the example does not support Appellant's argument. There is no alternative for how the District Court could have narrowed the condition to achieve the same goals here. The main problem was the communication itself between Santos Diaz and Fernandez.

Even if the special condition burdened Appellant's First Amendment rights, it survives the *Crandon* test. It survives the test for the same reasons addressed above and summarized here. The no-contact order was imposed by the Magistrate Judge to ensure that Santos Diaz complied with District Court orders and, as a result, did not commit any other crimes. *See* App. 36 (first releasing Santos Diaz with the no-contact condition, along with home confinement with electronic monitoring, because the Magistrate Judge was "troubled by the fact that there was a reach out from the defendants to the victim from the prison"); App. 53 ("So the reason why we impose those orders are for one reason and one reason only, so as they're followed . . . . [Y]ou've proven to the Court that you won't follow orders"). The condition protects the public because it prevents Santos Diaz from physically seeing Fernandez and repeating any instance of physical assault.

The condition is limited in scope. Contact between Appellant and Fernandez is completely prohibited only for two

27

years, during Appellant's supervised release period. The condition only limits Santos Diaz's contact with one person: Fernandez. It does not cover other individuals. Still, we note that the no-contact order does not have to be in place for Appellant's entire two-year term of supervised release. He, himself, or through his Probation Officer, may request that the District Court modify the conditions of his supervised release. *See* 18 U.S.C. § 3583(e). Under this statute, the District Court can "modify, reduce, or enlarge the conditions of supervised release" if the factors in 18 U.S.C. § 3553(a) warrant it. *Id.*

## III. Conclusion

For the foregoing reasons, we will vacate and remand the no-contact order imposed during Appellant's incarceration term and affirm the no-contact order imposed as a condition of his supervised release.

ROTH, <u>Circuit Judge</u>, dissenting in part.

The Majority adopts far too narrow a reading of the inherent authority of district courts.  The Majority correctly holds that the District Court lacked statutory authority to impose a no-contact order as a condition of Evan Santos Diaz's incarceration.  We do not stop, however, with statutory authority.  District courts also have inherent authority to impose no-contact orders when necessary to protect against significant interference with the administration of justice.[1]  Accordingly, where, as here, a district court has acted to avert two clear threats to the administration of justice, *e.g.*, harassment of witnesses and obstruction of justice, it has inherent authority to do so.  The Majority should not have ruled otherwise.  For that reason, I respectfully dissent.

I.

The Supreme Court has repeatedly held that district courts have "'equitable powers . . . over their own process, to prevent abuses, oppression, and injustice' that are inherent and equally extensive and efficient."[2]  Courts have defined this amorphous power to include, for example, authority over the "orderly and expeditious progress of trial," revocation of bail, grants of confidentiality orders, and protection of witnesses.[3]

---

[1] *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991).

[2] *Gumbel v. Pitkin*, 124 U.S. 131, 144 (1888); *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 35 (1984); *Bitter v. United States*, 389 U.S. 15, 16 (1976).  *See also Pansy v. Borough of Stroudburg*, 23 F.3d 772, 785 (3d Cir. 1994).

[3] *See, e.g.*, *Bitter*, 389 U.S. at 16 (holding that courts have inherent power over their process including the power to

1

In such scenarios, a district court, even though lacking statutory authority, may act "with restraint and discretion" in exercising its inherent authority.[4]

Neither the Supreme Court nor our Court has determined whether a district court has inherent authority to impose a no-contact order as a condition of confinement or as a sentencing condition, after the trial's end. However, other courts of appeals have addressed similar situations and endorsed a broad reading of inherent authority that allows a district court to act beyond the end of trial or sentencing.[5]

revoke bail and remit defendants to custody); *Degen v. United States*, 517 U.S. 820, 823 (1996) (noting courts have "certain inherent authority to protect their proceedings and judgments"); *Wheeler v. United States*, 640 F.2d 1116, 1123 (9th Cir. 1981) (recognizing trial courts' inherent authority to protect witnesses); *United States v. Wind*, 527 F.2d 672, 674–75 & n.2 (6th Cir. 1975) (noting Supreme Court's recognition of trial court's inherent power to revoke bail to "prevent disruptions caused by threats to witnesses" as "[t]he necessities of judicial administration prevail"); *Pansy*, 23 F.3d at 785 (reaffirming district courts' "inherent equitable power to grant confidentiality orders").

[4] *Chambers*, 501 U.S. at 44.

[5] *See, e.g.*, *Bryson v. United States*, 238 F.2d 657, 665 (9th Cir. 1956) (affirming the district court's prohibition of defendant communicating with jurors post-trial); *Wheeler*, 640 F.2d at 1116; *United States v. Morris*, 259 F.3d 894, 900 (7th Cir. 2001). Several state courts have upheld no-contact orders in criminal cases under parallel state forms of inherent authority. *See, e.g.*, *Hicks v. Alaska*, 377 P.3d 976, 979 (Alaska Ct. App. 2016) (upholding a no-contact order to protect witnesses); *New*

The Ninth Circuit Court of Appeals in *Wheeler v. United States* adopted this broad definition in affirming the district court's post-trial imposition of a no-contact order that prohibited a defendant from using his mail privileges to contact ten individuals.[6] There, the defendant had threatened to call a witness's family and employer.[7] The district court imposed the order to protect the witness after trial, holding that the authority to protect witnesses and jurors, even after the close of trial, came within the scope of the court's power to protect the administration of justice.[8] Such protection "encourage[es] . . . th[e] witness, and other potential witnesses, to come forward and provide information helpful in the implementation of justice."[9] As the Majority today rightfully notes, the "no-contact order was not only about the witness in this specific case but about encouraging other potential witnesses to provide information that played a role in achieving justice."[10]

The Seventh Circuit Court of Appeals in *United States v. Morris* also upheld the district court's authority to impose a

---

*Hampshire v. Ayoub*, No. 218-2017-CR-1636, 2018 WL 324996, at *5 (N.H. Super. Jan. 5, 2018) (upholding a no contact order to "protect the integrity of the fact-finding process").

[6] 640 F.2d at 1116. Santos Diaz points out that *Wheeler* predates the Sentencing Reform Act of 1984. However, he does not address the fact that similar cases, such as *Morris*, came after Congress legislated in this area.

[7] *Wheeler*, 640 F.2d at 1118.

[8] *Id.* at 1123.

[9] *Id.* at 1123–24.

[10] Op. at 17.

post-guilt no-contact order.[11]  Because Morris was adjudicated guilty without a trial, the victim never testified.[12]  However, Morris later sought to withdraw his guilty plea, providing for the possibility of a future trial in which the victim would testify.[13]  Thus, the district court imposed a post-guilt no-contact order "to protect his victim and her family from further harassment, and reduce the possibility of creating a reluctant witness."[14]  The court of appeals  agreed that these reasons for imposing the order justified and made proper the exercise of the power to protect the administration of justice.[15]

While the Majority takes no clear issue with *Morris*, it suggests the court in *Wheeler* improperly expanded the scope of inherent authority post-trial.[16]  I disagree.  The court in *Wheeler* rightfully noted that the "inherent power to protect witnesses stems from the indisputably . . . broad powers (of the trial judge) to ensure the orderly and expeditious progress of a trial."[17]  The logic and purpose of exercising district courts' inherent authority to protect witnesses—"protection against abuses, oppression, and injustice"—applies equally post-trial, as long as courts are restrained in their exercise of such power.[18]  In fact, the Supreme Court recently reinforced this

---

[11] 259 F.3d at 894.

[12] *Id.* at 901.

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *See* Op. at 21–22.

[17] 640 F.2d at 1123 (quoting *Bitter*, 389 U.S. at 16).

[18]  *See Gumbel*, 124 U.S. at 144.  Decades earlier, the Sixth Circuit used identical language and a similar analytical framework in extending pretrial courts' inherent authority to

4

broad reading, stating that courts may exercise inherent authority where it is a "reasonable response to the problems and needs confronting the court's fair *administration of justice*."[19]

## II.

Turning to the no-contact order in this case, we review a district court's imposition of a no-contact order for reasonableness.[20] Based on *Morris* and *Wheeler*, it was reasonable for the District Court here to find that contact with Amanda Fernandez presented a significant interference with the administration of justice and that a no-contact order was necessary to "shield the criminal justice system from 'abuses, oppression and injustice' and to 'protect witnesses.'"[21] As were the witnesses that the courts protected in *Morris* and *Wheeler*, Fernandez is a witness in a proceeding related to

---

protect witnesses. *United States v. Graewe*, 689 F.2d 54, 57 (6th Cir. 1982).

[19] *Dietz v. Bouldin*, 579 U.S. 40, 45 (2016) (emphasis added) (quoting *Degen*, 517 U.S. at 823–24).

[20] *United States v. Bungar*, 478 F.3d 540, 542–43 (3d Cir. 2007).

[21] *See United States v. Ward*, 131 F.3d 335, 337 (3d Cir. 1997) (recognizing that the District Court purported to act on its inherent authority to "shield the criminal justice system from 'abuses, oppression and injustice,' and to 'protect witnesses'" but affirming on different grounds); *Virgin Islands v. Roberts*, 756 F. Supp. 898, 900 (D.V.I. 1991) (noting that courts have inherent authority to shield "the administration of criminal justice from 'abuses, oppression, and injustice'" (citing *Bitter*, 389 U.S. at 16)).

5

Santos Diaz's offenses of assault, harassment, and obstruction of justice. Santos Diaz previously interfered with the administration of justice through destruction and theft of evidence. His phone calls with Fernandez suggest a continuing pattern of harassment and obstruction. Fernandez lied to the District Court when discussing her contact with Santos Diaz, stating that he had not contacted or threatened her when in fact he had further harassed her and asked her not just to drop charges against him but to destroy evidence of his assault and harassment. Despite her claims that she would report Santos Diaz's contact with her, Fernandez failed to do so in a timely manner, instead aiding him by asking that the court dismiss charges against him. Such conduct demonstrates that Santos Diaz was continuing to engage in "significant interference with the administration of justice," both through obstruction of justice and through the possibility of turning Fernandez into a reluctant witness.[22]

Both the Majority and Santos Diaz note that, unlike in *Morris*, Santos Diaz's assault case has been closed, thus ending Fernandez's role as witness in pending proceedings. *Morris* does not, however, limit courts in the exercise of their inherent authority to the protection just of witnesses who plan to testify. In fact, in *Wheeler*, the Ninth Circuit Court of Appeals upheld the no-contact order at issue after the threatened jurors' roles had ceased, finding that such an order "would be warranted . .

---

[22] *See Morris*, 259 F.3d at 894; *United States v. Darwish*, 755 F. App'x 359, 363 (5th Cir. 2018) (noting that courts have upheld no-contact conditions imposed "in response to credible concerns of harassment that would interfere with the administration of justice").

. even though the trial was over."[23]   Here, Santos Diaz's proceedings have also ceased.   However, his phone calls to Fernandez, in which he berates her for her involvement in his charges and orders her to destroy evidence and withdraw her claims, demonstrate ongoing obstruction of justice and harassment and threats to her safety.   Thus, based on the reasoning and analogous facts of both *Wheeler* and *Morris*, it was reasonable for the District Court to impose the no-contact order as a condition of Diaz's sentence.

III.

The Majority fears that affirming the District Court's imposition of the no-contact order based on the "logic espoused by *Wheeler* and *Morris*" would allow a district court to abuse the doctrine of inherent authority, imposing conditions on imprisonment in any scenario in which the court hoped to punish a defendant or alter an outcome.[24]   This fear is unfounded.

While the contours of inherent authority are not well defined, courts have placed limiting language on its exercise. For instance, a district court cannot explicitly defy a rule, statute, or constitutional provision.[25]   It cannot act simply to punish nor can it act at all absent exceptional circumstances

---

[23] *See* 640 F.2d at 1124.

[24] *See* Op. at 20 n.6.

[25] *Degen*, 517 U.S. at 823; *Dietz*, 579 U.S. at 45 ("[T]he exercise of an inherent power cannot be contrary to any express grant of or limitation on the district court's power contained in a rule or statute.").

7

which signal "abuses, oppression, or injustice."[26]   Thus, it is unlikely that a court could repeatedly find that a defendant's conduct had presented a "significant interference" in the administration of justice in such a way that a court could distort inherent authority into a tool to punish that defendant.

Moreover, while no court has fully defined what "a significant interference with the administration of justice" means, courts have outlined several narrow situations that qualify as "abuses, oppression and injustice."  Two of these situations are present here:  the need to protect witnesses and the need to prevent obstruction of justice.

Moreover, the Majority has not demonstrated how the "logic espoused by *Wheeler* and *Morris* would allow" a sentencing court to "impose many different types of punishment that are not provided for by federal statute."[27]  That is because it would not.  *Wheeler* and *Morris*, while similar to this case, are factually distinct from the Majority's proffered example:  segregation of a prisoner from the general prison population due to a judge's arbitrary label.  *Wheeler* and *Morris* were decided years ago, but the Majority has not cited any cases suggesting district courts have abused the precedent established in those cases.

Indeed, the exercise of inherent authority in this case serves not to punish, but rather to protect.  The Majority's analysis is based on a mischaracterization of the no-contact

---

[26] *Gumbel*, 124 U.S. at 144.
[27] *See* Op. at 20 n.6, 21.

8

order as a punishment.[28]  The District Court did not, however, impose the no-contact order to punish Santos-Diaz.  Instead, as in *Morris*, in which the no-contact order was imposed to protect the victim from harassment,[29]  the court ordered that Santos Diaz have no contact in order to prevent obstruction of justice and to protect Fernandez from further harassment.

## IV.

In sum, I cannot join the Majority's limitations on a district court's exercise of inherent authority.  Because the District Court properly exercised its inherent authority under *Wheeler*, *Morris*, and related Supreme Court precedent, I would affirm the judgment of the District Court.

---

[28] *See* Op. at 20 (noting that "there is nothing to suggest that inherent authority as a concept should be used to justify corrective measures after trial—such as no-contact conditions during incarceration").  The Majority argues that they do not "read the no-contact order to punish Santos Diaz."  Op. at 20 n.7.  However, the Majority cautions that "inherent authority could allow a court to [impose punishment not authorized by statute], serving as an unfettered source of power."  Op. 20 at n.6.

[29] 259 F.3d at 901.  *See also* Op. 18 (recognizing that in *Wheeler*, "[i]mportantly, the no-contact order's goal was not to punish defendant, but to protect the victim and her family").