**FILED**
**United States Court of Appeals**
**Tenth Circuit**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**November 26, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

ERIC HONORS,

    Defendant - Appellant.

No. 24-3118

_____

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 6:23-CR-10030-EFM-1)**

_____

Kayla Gassmann, Assistant Federal Public Defender (Melody Brannon, Federal Public Defender, with her on the briefs), Kansas Federal Public Defender, Kansas City, Kansas, for Defendant–Appellant.

Jason W. Hart, Assistant United States Attorney (Duston J. Slinkard, Acting United States Attorney with him on the brief), District of Kansas, Wichita, Kansas, for Plaintiff–Appellee

_____

Before **HARTZ**, **McHUGH**, and **EID**, Circuit Judges.

_____

**McHUGH**, Circuit Judge.

_____

    In February 2023, Eric Honors shut his then sixteen-year-old stepdaughter, B.J., in the sleeper cab of his commercial semi-truck parked outside their home near Wichita, Kansas. There, he sexually assaulted her. Later, while driving from Kansas

to Texas, Mr. Honors held B.J. captive in his truck and repeatedly sexually assaulted her. He took various videos of these episodes of abuse. Detectives later recovered three videos Mr. Honors recorded in Kansas. B.J. testified that he also forced her to record sexually explicit images of herself in Oklahoma and that Mr. Honors recorded himself sexually assaulting B.J. in Texas. The Oklahoma and Texas videos were never recovered.

A federal jury convicted Mr. Honors of (1) transportation of a minor with intent to engage in criminal sexual activity, 18 U.S.C. § 2423(a) ("Count 1"); and (2) production of child pornography, 18 U.S.C. § 2251(a) ("Count 2"). The district court imposed consecutive sentences totaling sixty years of imprisonment and ten years of supervised release. It also imposed a special condition of supervised release forbidding Mr. Honors from contacting B.J. or any of her family members without the court's permission. Although the district court at first refused to apply this no-contact order to Mr. Honors's term of incarceration, it sua sponte reconvened the parties shortly after the sentencing hearing concluded and imposed the same no-contact condition during his sixty-year term of incarceration. B.J.'s family included Mr. Honors's four biological children with his wife—B.J.'s half-siblings.

Mr. Honors raises three issues on appeal: whether the district court (1) constructively amended Count 2 because the jury instruction's omission of the indictment's language that the offense happened "in the District of Kansas" broadened the possible bases for conviction; (2) lacked authority to impose the no-

2

contact order prohibiting Mr. Honors from contacting his wife and children during his term of incarceration; and (3) lacked a compelling justification to impose the supervised-release special condition prohibiting Mr. Honors from contacting his wife and children. ROA Vol. I at 202.

With respect to the removal of the indictment's reference to Kansas in the jury instructions, we conclude any presumed error was not plain. On the second issue, we hold the district court lacked statutory and inherent authority to impose the custodial no-contact order. As to the no-contact special condition during Mr. Honors's ten-year term of supervised release, it infringed his constitutional rights to familial affiliation without compelling justification.

Exercising jurisdiction under 18 U.S.C. § 3732(a), we affirm Mr. Honors's conviction on Count 2, vacate the custodial no-contact order in its entirety, and vacate the portion of the supervised-release special condition prohibiting contact with his wife and biological children.[1]

---

[1] Mr. Honors does not challenge the special condition of supervised release as applied to B.J. Mr. Honors likewise does not challenge the custodial no-contact order as applied to B.J., but we vacate the no-contact order in its entirety because the district court lacked jurisdiction to impose it. *See City of Albuquerque v. Soto Enters., Inc.*, 864 F.3d 1089, 1093 (10th Cir. 2017) (explaining jurisdictional defects can never be waived and can be raised sua sponte by a court); *United States v. Blackwell*, 81 F.3d 945, 947 (10th Cir. 1996) (addressing the question of the district court's authority to modify a defendant's sentence as a question of the district court's subject matter jurisdiction).

## I.    BACKGROUND

### A.  Factual Background[2]

#### 1.    B.J.'s Testimony at Trial

B.J. testified that in the early morning of February 15, 2023, at their home near Wichita, Kansas, Mr. Honors entered her room, woke her, and asked her to "help bring stuff onto his truck." ROA Vol. III at 421. Once B.J. was inside the parked truck, she saw Mr. Honors holding a handgun. He demanded she take off her clothes, and he sexually assaulted her while pointing the gun at her.

That same morning, with B.J. in the sleeper cab, Mr. Honors drove the truck out of Kansas, through Oklahoma, and to Texas where he was dropping off a load. While driving through Oklahoma, Mr. Honors made B.J. come up to the passenger seat, handed her one of his two iPhones, and demanded she "take a video of [her] whole body without any clothes on." *Id.* at 427. He also forced her to watch pornographic videos and stated she was "going to be doing [that] and [that] he [was] going to teach [her] how to do it." *Id.* at 428.

Mr. Honors then directed B.J. to contact her mom, his wife, and report that B.J. left the house on her own accord. During the drive from Kansas to Texas, Mr. Honors did not let B.J. get out of the truck. Once they arrived in Texas, Mr. Honors forced B.J. to perform oral sex on him and took a video of her doing so.

---

[2] We derive this summary of facts from the evidence presented at trial.

B.J.'s mother and grandmother grew concerned over her prolonged absence and arranged with Mr. Honors to have B.J.'s cousin, who lived in Texas, pick her up to return her to Kansas. Before she got out of the truck to meet her cousin, Mr. Honors threatened B.J. "that he ha[d] people sitting on [her] mom and grandma's house." *Id.* at 468. After B.J. left with her cousin, she called a friend "and told her everything that happened." *Id.* at 438. The friend's father then called 911 and reported Mr. Honors's conduct to the authorities.

## 2.    Videos Recorded in Kansas

After arresting Mr. Honors, detectives recovered one iPhone from Mr. Honors's truck. They found three videos in the phone's recently deleted files. Department of Homeland Security Investigations Special Agent Travis Putrah testified at trial about the three videos, which were introduced as exhibits Gov-1, Gov-2, and Gov-3. Metadata revealed that the videos were recorded at Mr. Honors's home's driveway in Kansas and were made between 2:22 and 2:29 a.m. on February 15, 2023. All three videos were then deleted between 3 and 4 a.m. the same morning, while B.J. and Mr. Honors were still in Kansas. The jury watched these three videos.

Agent Putrah explained that the first video, Gov-1, was "only one second long" and contained no visual, but there was audio of "a sniffle or a cry." *Id.* at 331.

The second video, Gov-2, was almost three minutes long. Recounting the contents of the video, Agent Putrah testified

> [W]hen the video starts you will see that it is in the back of a semi-truck. You will see B.J. She is dressed in a black tank top and black shorts. You will see

5

Mr. Honors tell them—tell B.J. to stand up and take her shorts off. She will be crying during this video. She will begin to take her shorts off, and he, basically, at that point in time says if you're not going to act right, I'm going to get rid of you.

*Id.* at 349. He also testified that the video depicted Mr. Honors grabbing a gun.

The third and final video, Gov-3, was recorded "at or near Mr. Honors and B.J.'s residence," at 2:29 a.m. *Id.* at 350–51 Describing this video, Agent Putrah stated: "The beginning of the video will be B.J.'s vagina. It will be a close-up of her vagina. You will hear Mr. Honors say spread it. You will hear B.J. crying a lot." *Id.* at 351. He narrated that B.J. can then be heard saying "ow, a lot" and that B.J. tells Mr. Honors in the video that "it hurts when you go like right there, and she points down at her vagina." *Id.* at 351–52. And "during this time" in the video, "[t]here [are] some sucking sounds." *Id.* at 352.

Mr. Honors admitted having two iPhones but told investigators the second phone fell into a cup of water and no longer worked. The second phone along with the Oklahoma and Texas videos described by B.J. in her testimony (the former of her recording her naked body and the latter of her being forced to perform oral sex on Mr. Honors) were never recovered.

### B. Procedural History

#### 1. The Indictment

In March 2023, a federal grand jury in the United States District Court for the District of Kansas indicted Mr. Honors, charging him with (1) transportation of a minor with intent to engage in criminal sexual activity, in violation of 18 U.S.C. § 2423(a), and

(2) production of child pornography, in violation of 18 U.S.C. § 2251(a). Count 2 of the indictment read as follows

> On or about February 15, 2023, *in the District of Kansas*, the defendant, ERIC HONORS, knowingly used, persuaded, induced, enticed, and coerced Minor Victim, a minor whose identity is known to the Grand Jury, to engage in sexually explicit conduct for the purpose of producing *a visual depiction* of such conduct, and knowing and having reason to know that such visual depiction would be transported in and affecting interstate and foreign commerce by any means; and that the visual depiction was produced and transmitted using materials that have been mailed, shipped, and transported in and affecting interstate and foreign commerce by any means, including by computer, and 2) if such visual depiction has actually been transported or transmitted using any means or facility of interstate and foreign commerce and in and affecting interstate and foreign commerce and mailed. In violation of Title 18, United States Code, Section 2251(a) and (e).

ROA Vol. I at 18 (emphasis added). Mr. Honors rejected two plea offers and proceeded to trial.

## 2.     Jury Instruction for Count 2

Each party proposed a jury instruction for Count 2. The defense's proposed instruction stated that the Government must prove beyond a reasonable doubt that "[s]ome or all of Mr. Honors'[s] actions occurred in Kansas." *Id.* at 145. The Government's proposed instruction contained the same language. At the jury instruction conference, the Government suggested removing the geographic element, and the district court agreed, stating, "I'm not sure why we have the Kansas—that may be relevant for venue, but that's no longer an issue. We can strike [that element]." ROA Vol. III at 607–08. Defense counsel had no objection, and the final jury instruction for Count 2 omitted the reference to Kansas.

7

The final jury instruction for Count 2 also stated that the Government must prove "[t]he defendant knowingly used or coerced B.J. to engage in sexually explicit conduct for the purpose of producing *any* visual depiction of such conduct." ROA Vol. I at 215 (emphasis added). The indictment, on the other hand, charged Mr. Honors with "producing *a* visual depiction of such [sexually explicit] conduct." *Id.* at 18 (emphasis added).

### 3.    Closing Statements

In addressing Count 2—that Mr. Honors used B.J. to produce the video—the prosecutor reminded the jury of B.J.'s testimony that "on the way to Oklahoma she was handed a phone and forced to video her breasts, her vagina, and her feet." ROA Vol. III at 677. The prosecutor argued that by forcing B. J. "to video her vagina" Mr. Honors was "using her for the sexual purpose of producing the visual depiction." *Id.* The prosecutor also called attention to B.J.'s testimony "that when she was in Texas, she was forced to perform oral sex[,] and he took a video of it." *Id.* Later in her closing argument, the prosecutor noted the jurors had watched the videos filmed "here in Kansas" but also reminded them about "B.J.'s testimony that [Mr. Honors] took a video of her performing oral sex in Texas, and [her] testimony . . . that she was forced to video her vagina and her breasts and her feet and had to do it several times." *Id.* at 705. The prosecutor concluded by stating, "That is her testimony about the visual depiction." *Id.*

In closing, defense counsel argued that the third Kansas video did not meet the definition of child pornography because the video was "spontaneous," and its focus was "not her genitals. It start[ed] there, but it [was] not the focus." *Id.* at 694–95.

The jury entered a general verdict, convicting Mr. Honors of both counts. The verdict did not specify any particular video as the basis for the conviction on Count 2.

### 4.    Violation of Pre-Sentencing No-Contact Order

At a detention hearing held on March 6, 2023, the Government moved for (1) Mr. Honors's detention pending trial and (2) a no-contact order prohibiting Mr. Honors from contacting B.J. or her mother—Mr. Honors's wife—pending trial. The district court granted both motions.

While Mr. Honors was in custody pre-trial, he drafted several letters addressed to his wife, in violation of the no-contact order. In the letters, Mr. Honors requested that his wife and B.J. tell the court "that masked men from a cartel came aboard [Mr. Honors's] truck, held [Mr. Honors] and the minor victim at gun point, forced them to allow the cartel to use [Mr. Honors's] truck for transport of illegal narcotics, and forced them to engage in and film sexual activity to ensure their silence." ROA Vol. II at 11. He gave the letters to a fellow inmate who was scheduled to be released. The letters were intercepted at the jail and forwarded to the assistant United States attorney assigned to the case. The district court denied Mr. Honors's claim that the letters were protected by the marital communication privilege.

**5.     Sentencing**

The district court imposed consecutive sentences of thirty-five years for Count 1 and twenty-five years on Count 2, totaling sixty years of imprisonment, and ten years of supervised release. Because Mr. Honors was thirty-eight years old at the time, the court acknowledged that this sentence was "in all practically [] a life sentence." ROA Vol. III at 752.

*a.     Special condition of supervised release*

In addition to the standard terms of imprisonment and supervised release, the district court imposed a special condition of supervision that Mr. Honors have no contact with the "victim, or victim's family by any means" unless "approved by the court." ROA Vol. I at 250. The district court recognized that this no-contact provision covered Mr. Honors's family members, since "some of the victim's family are his own children." ROA Vol. III at 753–54. Mr. Honors and B.J.'s mother married in 2015, and they have four biological children together, who are B.J.'s half-siblings. These children were ages three, five, six and eight at the time of sentencing. Defense counsel objected to the condition of no contact "with any members of [B.J.'s] family" for "being ambiguous, too broad, and unjustified." *Id.* at 759.

In explaining why it was imposing this special condition, the district court said it could not "consider [Mr. Honors] a good dad in light of what he did to his stepdaughter and in light of what he did to his own children's half[-]sister." *Id.* at 754. The court further stated that it was "skeptical that [his biological children were] going to want to

10

have contact with him." *Id.* The district court also reasoned that Mr. Honors's "attempt to obstruct justice by contacting his wife—or attempting to contact his wife and through her the minor victim to obtain obstruction" rendered the condition of supervision "appropriate." *Id.* And the district court concluded based on the totality of the facts from the trial that "this case [was] especially horrific." *Id.* at 751.

b.      *Custodial no-contact order*

The Government then asked for clarification of its understanding that the present no-contact order would remain in effect during Mr. Honors's prison term, citing *United States v. Grigsby*, 854 F. App'x 249 (10th Cir. 2021) (unpublished), as a case where the Tenth Circuit upheld a similar no-contact order in which the defendant was prohibited from contacting one of his biological children while he was imprisoned. Defense counsel objected that the Government was "asking the [c]ourt to cut off contact with dozens of people without any input from dozens of people about whether they want that contact cut off." ROA Vol. III at 763. The district court refused to apply the no-contact order during Mr. Honors's term of imprisonment, reasoning that the Bureau of Prisons ("BOP") determines the conditions of confinement and that the district court "would not have any authority to impose those conditions." *Id.* The district court then noted the objections, imposed the sentence, remanded Mr. Honors to custody, and concluded the hearing at 11:46 a.m.

Around an hour and a half later the same day, at 1:26 p.m., the district court convened a second sentencing hearing to revisit the custodial no-contact order. The

district court announced that upon reading *Grigsby*, it determined it had "ancillary jurisdiction in this matter." *Id.* at 769. In light of this authority, the district court indicated that it intended to "impose a civil injunction, not as a part of the criminal sentence," to order "that while in the Bureau of Prisons custody [Mr. Honors] also is prohibited from having contact with the family of the minor victim."[3] *Id.* at 769. The court noted its justification for this custodial order was the same as "the reasons discussed in [the] sentencing hearing this morning" for imposing the special condition of supervised release. *Id.*

Defense counsel objected "to reopening and going on the record and changing the ruling." *Id.* She noted that B.J. would turn eighteen within the next few months, that the court did not know whether B.J. would continue to live with her mother and half-siblings, and that "there's no record that these people are seeking to not have contact with" Mr. Honors. *Id.* at 770. Defense counsel also objected to the custodial no-contact order on the basis that it violated Mr. Honors's First Amendment right of association and his due process rights, it was overbroad, and it was not justified by the record. She further clarified that Mr. Honors objected to the no-contact order only as it applied to "the family" of B.J. but had no objection to an order of no contact with B.J. herself. *Id.*

---

[3] The new no-contact order is broader than the one in effect preceding trial because, in addition to B.J. and her mother, it prohibits contact with Mr. Honors's biological children, B.J.'s half-siblings, as well as any other members of B.J.'s family.

12

The district court entered a separate order on the docket, which provided that, "Pursuant to its ancillary jurisdiction, and in conjunction with Defendant's sentence, the Court orders that Defendant have no contact with the Minor Victim in this case or the Minor Victim's family while Defendant remains incarcerated." ROA Vol. I at 245. The district court also included an asterisk in the criminal judgment noting the civil injunction with the following language

> Pursuant to the [c]ourt's ancillary civil jurisdiction, *see U*[*nited*] *S*[*tates*] *v. Grigsby*, 854 F. App'x 249, 253-54 (10th Cir. 2021), the defendant shall have no contact with his victim, or his victim's family, by any means, including, but not limited to, in person, by phone, via computer, in writing or through a third party, unless approved by the [c]ourt, during his term of imprisonment.

*Id.* at 247 (emphasis omitted). Mr. Honors timely appealed.

## II.　ANALYSIS

### A. *Constructive Amendment*

Mr. Honors argues that the trial evidence, jury instructions, and prosecutor's closing argument constructively amended the indictment on Count 2, impermissibly broadening the possible bases for conviction beyond those specified in the indictment. The Government maintains no constructive amendment occurred because the indictment "did not specify any particular [visual] depiction." Appellee's Br. at 13. Moreover, the Government argues that only the modification of essential elements, not means, can constructively amend an indictment. And because the Government maintains a visual depiction is not an element of 18 U.S.C. § 2251, it concludes there would be no constructive amendment even if the indictment had specified a particular video.

Mr. Honors did not object before the district court to the constructive-amendment error he now alleges. "We review unobjected-to claims of constructive amendment under a plain error standard." *United States v. Gonzalez Edeza*, 359 F.3d 1246, 1250 (10th Cir. 2004). Under this demanding standard, the defendant must establish an "(1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Gorsuch, Ltd., B.C. v. Wells Fargo Nat'l Bank Ass'n*, 771 F.3d 1230, 1239 (10th Cir. 2014) (quotation marks omitted). "However, we apply this rule less rigidly when reviewing a potential constitutional error." *United States v. James*, 257 F.3d 1173, 1182 (10th Cir. 2001). Here, Mr. Honors cannot meet this burden.

Even assuming Mr. Honors could prevail on his claim that the district court erred, he cannot satisfy the second prong of the plain-error standard—that the error would be "clear or obvious under current law." *United States v. Rosales-Miranda*, 755 F.3d 1253, 1258 (10th Cir. 2014) (quotation marks omitted). This is because whether the indictment pertaining to Count 2 alleged a violation of a specific set of facts—the "visual depiction" being a video recorded in Kansas—is neither clear nor unambiguous. 18 U.S.C. § 2251.

"[A] fundamental precept of federal constitutional law [is] that a 'court cannot permit a defendant to be tried on charges that are not made in the indictment.'" *Hunter v. New Mexico*, 916 F.2d 595, 598 (10th Cir. 1990) (quoting *Stirone v. United States*, 361 U.S. 212, 217 (1960)). Because an accused has a Sixth Amendment right to be informed of the nature of the charges against him, "a fatal variance" between the indictment and

14

the evidence presented at trial "denies a defendant this fundamental guarantee because it destroys his right to be on notice of the charge brought in the indictment." *Id.* This rule against impermissible variances is also rooted in the accused's "Fifth Amendment right to be indicted by a grand jury on the charges against him." *United States v. Miller*, 891 F.3d 1220, 1237 (10th Cir. 2018).

We recognize two types of variances. *See United States v. Sells*, 477 F.3d 1226, 1237 (10th Cir. 2007). On one end of the spectrum, there is the simple variance, which occurs "when the charging terms are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment." *Hunter*, 916 F.2d at 598 (quotation marks omitted). On the other end is a much "more severe alteration[]"—the constructive amendment. *Id.* at 599.

"A constructive amendment occurs when the district court's instructions and the proof offered at trial broaden the indictment." *United States v. Koerber*, 10 F.4th 1083, 1116 (10th Cir. 2021) (internal quotation marks omitted). "Although the difference between the two types of variances is shadowy at best, a constructive amendment is more dangerous because it actually modifies an essential element of the offense charged." *Hunter*, 916 F.2d at 599 (internal quotation marks and citation omitted). But the mere "addition or deletion of nonessential factual averments" is not a constructive amendment; "[r]ather, the amendment must effectively alter the substance of the indictment." *Id.* And the substance of the indictment is altered when "the district court proceedings [] modify an essential element of the offense or raise the possibility the defendant was convicted of

an offense other than that charged in the indictment." *United States v. DeChristopher*, 695 F.3d 1082, 1095 (10th Cir. 2012) (quotation marks omitted). "Even under plain error review, we will find that a constructive amendment occurred when the evidence presented at trial, together with the jury instructions, *raises the possibility* that the defendant was convicted of an offense other than that charged in the indictment." *Miller*, 891 F.3d at 1231 (internal quotation marks omitted).

"In assessing a claim of an impermissible constructive amendment" we "compare the indictment with the district court proceedings to discern if those proceedings broadened the possible bases for conviction beyond those found in the operative charging document." *Id.* at 1231–32 (quotation marks omitted). We have found constructive amendments where the jury instructions did not limit a finding of guilt to essential and explicit particularities averred in the indictment. *See id.* at 1234–36 (describing in-circuit and out-of-circuit constructive amendment caselaw).

In relevant part, the indictment charged Mr. Honors with violating 18 U.S.C. § 2251(a) through the following conduct:

> On or about February 15, 2023, in the District of Kansas, the defendant, ERIC HONORS, knowingly used, persuaded, induced, enticed, and coerced Minor Victim, a minor whose identity is known to the Grand Jury, to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct

ROA Vol. I at 18. The jury instructions for Count 2 provided that one of the elements the jury must find beyond a reasonable doubt to convict Mr. Honors was that he "knowingly used or coerced B.J. to engage in sexually explicit conduct for the purpose of producing

16

any visual depiction of such conduct." *Id.* at 215. In her closing statement, the prosecutor told the jury it could convict Mr. Honors of Count 2 based on the third recovered video (Gov-3) that was filmed in Kansas or based on the unrecovered videos recorded in Oklahoma and Texas as described by B.J.

Mr. Honors argues that the indictment specifically charged him with "producing child pornography based on Gov-3, the Kansas video." Appellant's Br. at 14. Thus, he contends that "the jury instruction, trial evidence, and prosecutor's closing argument together constructively amended Count 2 by allowing the jurors to convict [him] based on the uncharged Oklahoma and Texas videos." *Id.*

If the indictment had limited the charge to a specific "visual depiction of" "sexually explicit conduct" that occurred in Kansas, then Mr. Honors would be correct that it would have limited his notice as to what "sexually explicit conduct" he was accused of "knowingly us[ing] or coerc[ing] B.J. to engage in," as well as which "visual depiction of such conduct" he was accused of having produced. Under those circumstances, the Government could convict Mr. Honors based only on the third Kansas video. In other words, *if* the indictment was explicitly limited to videos recorded in Kansas, it would "allege[] a violation of the law based on a specific set of facts," and the instructions would need to limit a finding of guilt to that set of facts. *Miller*, 891 F.3d at 1234.

But it is uncertain whether there is an actual variance between the indictment and district court proceedings. The first sentence of the indictment—"On or about

February 15, 2023, in the District of Kansas, the defendant, Eric Honors, knowingly used, persuaded, induced, enticed, and coerced Minor Victim . . . to engage in sexually explicit conduct"—can be read to tie the geographical element to Mr. Honors's act of using or coercing B.J., *or* it can be understood to tie this geographical element to B.J.'s forced engagement "in sexually explicit conduct." ROA Vol. I at 18 (emphasis omitted). If the latter, then the video must have been filmed in Kansas, because the video constitutes the "visual depiction of *such*" sexually explicit conduct. 18 U.S.C. § 2251 (emphasis added). If the former, however, the video could have been filmed in other moments along the route to Texas or in Texas. That is because Mr. Honors could have coerced B.J. (for instance, by brandishing his gun) in Kansas "with the intent" that she engage in sexually explicit conduct in Texas.[4] *Id.*

"[I]t is settled law in this circuit, as elsewhere, that the language employed by the government in its indictments becomes an essential and delimiting part of the charge itself, such that if an indictment charges particulars, the jury instructions and evidence introduced at trial must comport with those particulars." *Miller*, 891 F.3d at 1235

---

[4] Likewise, we conclude the variance between the indictment's language referring to "a visual depiction" and the jury instruction's "any visual depiction" to be ambiguous as to whether it allows the jury "to convict [Mr. Honors] on a different set of facts than those set forth in the [indictment]," *Hunter v. New Mexico*, 916 F.2d 595, 599 (10th Cir. 1990). *Compare* ROA Vol. I at 18 (indictment charge of Count 2) *with id.* at 215 (jury instruction for Count 2). While the indictment can be read to specify one video, and the instructions to include more than one video, this same language can be interpreted to indicate that Mr. Honors only need have produced "a" visual depiction—not more than one—and "any" similarly tells the jury it need only find one such visual depiction to sustain the conviction.

(quotation marks omitted). Importantly, however, the cases we have cited in support of this proposition all involved obvious variances. *Id.* at 1235–36. For example, in *Miller* the indictment charged the defendant with making a specific false statement and described the particular statement alleged to be false. *Id.* at 1236. But at trial, the government presented evidence of an additional false statement, and the jury instructions failed to narrow the basis for conviction to the false statement specified in the indictment. *Id.* Under those circumstances, we concluded an improper constructive amendment had occurred. *Id.* In other words, where the indictment charges specific "particulars" that are explicit, the trial proceedings must track with those particulars. [5]

It is true, we have said that "a constructive amendment occur[s]" when the district court proceedings "*raise[] the possibility* that the defendant was convicted of an offense other than that charged in the indictment." *Id.* at 1231 (quotation marks omitted). But

---

[5] Our sibling circuits are in accord. *See, e.g.*, *Miller*, 891 F.3d at 1235 (citing *United States v. Ward*, 747 F.3d 1184, 1192 (9th Cir. 2014) and stating that the Ninth Circuit held a "constructive amendment occurred where defendant was indicted for aggravated identity theft as to two named victims, but trial evidence and prosecutor's arguments referred to other individual victims, and jur[y] instructions did not specify that conviction must be based on victims named in the indictment"); *id.* (citing *United States v. Weissman*, 899 F.2d 1111, 1112–14 (11th Cir. 1990) and stating that the Eleventh Circuit concluded a "constructive amendment occurred when indictment alleged that defendant committed a RICO violation 'while employed by or associated with an enterprise, to wit, a group . . . known as the DeCavalcante Family of La Cosa Nostra,' but district court instructed jury that 'it isn't necessary for [the government] to prove that the enterprise was the DeCavalcante Family if there was an enterprise proved that meets the definitions of the term'" (alterations in original)).

there we were not referring to the mere possibility that the language in the indictment created a variance with the district court proceedings. *Id*. at 1236. Rather, the uncertainty that can support a constructive amendment arises where a clear variance between the particulars in the indictment and the proceedings raises the possibility that the "jury based its finding of guilt on a different" set of facts than those specified in the indictment, *id.*, and those facts are "[]necessary to and []dependent o[n] the essential parts" of the charged offense. *Hunter*, 916 F.2d at 599 (quoting *United States v. Miller*, 471 U.S. 130, 136 (1985)).

Here, Mr. Honors has not established the indictment unambiguously limited the charge to videos recorded in Kansas. As discussed, the indictment can be read to refer to coercion in Kansas that resulted in videos recorded in multiple states. And Mr. Honors has failed to identify settled law in this circuit that constructive amendments occur even when the language underlying the alleged variance is subject to two reasonable interpretations—one of which creates a variance and the other which eliminates it. *See Miller*, 891 F.3d at 1236; *United States v. Juarez-Galvan*, 572 F.3d 1156, 1159 (10th Cir. 2009) (noting that the defendant "bears the burden to establish plain error warranting relief").

Because the language in the indictment does not explicitly and unambiguously limit the charged offense to specific videos and we have not determined a constructive variance occurs in such ambiguous circumstances, we cannot conclude that the district court clearly erred by expanding "the possible bases for conviction." *Miller*, 891 F.3d

20

at 1232 (quotation marks omitted). Accordingly, Mr. Honors's claim fails under the second prong of plain error because, even assuming without deciding that the district court erred, the error was not plain.

### B. Custodial No-Contact Order

Mr. Honors makes three overarching arguments against the district court's imposition of the custodial no-contact order. First, he argues the district court lacked authority to modify his sentence. Second, he contends the district court lacked both statutory and inherent authority to impose the no-contact order during his incarceration period. Third, he asserts that the no-contact order violated his constitutional rights.

"We review de novo the district court's legal determination that it possessed jurisdiction to modify [a d]efendant's sentence," *United States v. Blackwell*, 81 F.3d 945, 947 (10th Cir. 1996), as well as the court's decision to "impose a specific sentence, such as a no-contact order." *United States v. Santos Diaz*, 66 F.4th 435, 442 (3d Cir. 2023); *see United States v. Cook*, 952 F.2d 1262, 1263 (10th Cir. 1991) ("We apply a de novo standard of review to questions of a sentence's legality."); *United States v. Maher*, 919 F.2d 1482, 1485 (10th Cir. 1990) ("Legal conclusions are reviewed de novo.").

### 1. Authority To Modify a Sentence

The district court's authority to modify a sentence is limited by rule and statute. "In general, once a court has imposed a sentence, the court has no authority to modify that sentence." *United States v. Mannie,* 971 F.3d 1145, 1148 (10th Cir. 2020); *see also* 18 U.S.C. § 3582(c). However, Congress has provided three limited exceptions to that

general rule. *Mannie*, 971 F.3d at 1148. A district court may modify a sentence as "expressly permitted by statute or Rule 35 of the Federal Rules of Criminal Procedure," 18 U.S.C. § 3582(c)(1)(B); upon motion of the BOP, or upon motion of the defendant after failure of the BOP to bring a motion, when there are "extraordinary and compelling circumstances" for a reduced sentence or when the defendant meets specific qualifications regarding age and length of time served and the BOP has determined that the defendant poses no danger to any person or to the community, *id.* § 3582(c)(1)(A); and when the United States Sentencing Commission has lowered the applicable sentencing range, *id.* § 3582(c)(2). Thus, Mr. Honors is correct that if the no-contact order here is part of Mr. Honors's sentence and was imposed after the conclusion of Mr. Honors's sentencing hearing, the district court's ability to modify that sentence was limited to those three exceptions as a matter of statutory jurisdiction.[6] *See United States v. Luna-Acosta*, 715 F.3d 860, 863 (10th Cir. 2013) ("A district court's ability to modify a sentence . . . is jurisdictional.").

---

[6] Although we address the argument presented by Mr. Honors, we note that there are other reasons to question the district court's decision. Even if the second hearing is viewed as a continuation of the sentencing hearing, the district court's authority to impose a no-contact order during Mr. Honors's imprisonment was severely limited. Congress has delegated the authority over incarcerated persons to the Bureau of Prisons. *See* 18 U.S.C. § 3621, et seq. (Sentencing Reform Act of 1984). Unless otherwise provided by statute, the sentencing court generally lacks the authority to impose, rather than recommend, conditions on the prisoner's terms of incarceration. *See United States v. Santos Diaz,* 66 F.4th 435, 442 (3rd Cir. 2023); *United Sates v. Kerr,* 472 F.3d 517, 520 (8th Cir. 2006).

Federal Rule of Criminal Procedure 35(c) defines sentencing as "the oral announcement of the sentence." And this court has adopted the Fifth Circuit's standard that sentencing is final once there has been a "formal break in the proceedings from which to logically and reasonably conclude that sentencing had finished." *Luna-Acosta*, 715 F.3d at 865 (quoting *United States v. Meza*, 620 F.3d 505, 509 (5th Cir. 2010)). Here, the district court orally imposed a sentence on Mr. Honors and adjourned the sentencing hearing. The court then sua sponte scheduled a second hearing, which it began by stating, "We held a sentencing hearing on Mr. Honors this morning and the [c]ourt imposed [a] sentence." ROA Vol. III at 768.

Under our formal break standard, the district court's oral pronouncement in the first sentencing hearing became a final sentence for purposes of Rule 35(c). The district court finalized all terms of the sentence, gave the parties a chance to object to the sentence's terms, and adjourned the hearing in a way that left no impression that the sentence was tentative or that the court intended to revisit the issue of the custodial no-contact order. *Compare Luna Acosta*, 715 F.3d at 865 (concluding there was no formal break in proceedings because "most important[ly]" the district court "*continued* the first hearing . . . without finalizing all of the terms" or permitting the parties to object), *and United States v. Burgos-Andújar*, 275 F.3d 23, 30–31 (1st Cir. 2001) (concluding that an initial announcement of sentence was only "tentative" when the court permitted the defendant to continue her allocution), *with United States v. Ross*, 557 F.3d 237, 238, 243 (5th Cir. 2009) (holding that the district court had no authority to modify a sentence when

23

it sua sponte scheduled a second hearing after the initial sentencing hearing had concluded). Thus, any changes the district court made to the conditions of Mr. Honors's sentence after it concluded the first sentencing hearing constituted a sentence modification.

Yet the modification of the terms of Mr. Honors's incarceration was not supported by any of the three exceptions to the general finality of sentences set forth in 18 U.S.C. § 3582(c). The Government does not argue that the district court's reopening of the sentencing hearing to modify the terms of Mr. Honors's incarceration was "expressly permitted by statute or Rule 35 of the Federal Rules of Criminal Procedure." 18 U.S.C. § 3582(c)(1)(B). And the reopening and modification was clearly not based upon a motion by the BOP or by Mr. Honors, nor was it based on the post-sentencing lowering of an applicable sentencing range by the United States Sentencing Commission. *See id*. § 3582(c)(1)(A) and (c)(2). The district court therefore lacked statutory authority to modify the terms of Mr. Honors's incarceration.

The Government does not challenge the statutory limitations on the modification of a sentence. Instead, it asserts that, "regardless of statutory authority," the district court properly imposed the no-contact order "as a civil injunction pursuant to its ancillary jurisdiction." Appellee's Br. at 23–24. We disagree.

24

First, whether the custodial no-contact order is a civil injunction, it imposes a condition on Mr. Honors's confinement during his prison sentence.[7] We have concluded that the district court lacked statutory jurisdiction to do so.

The remaining question before us, therefore, is whether the district court had ancillary authority to impose this term of no-contact during to Mr. Honors's criminal sentence. We answer that question, no.

Accordingly, we vacate the custodial no-contact order on jurisdictional grounds.

## 2.    Ancillary Authority

Despite the absence of any statutory authority, the district court and the Government claim authority to impose the no-contact order under the court's "ancillary jurisdiction." ROA Vol. III at 769. To be sure, "'[f]ederal courts are courts of limited jurisdiction,' possessing 'only that power authorized by Constitution and statute.'" *Pueblo of Jemez v. United States*, 790 F.3d 1143, 1151 (10th Cir. 2015) (quoting *Gunn v. Minton*, 568 U.S. 251, 256 (2013)). Yet the Supreme Court has recognized that "'[c]ertain implied powers must necessarily result to our Courts of justice from the nature

---

[7] Our sister circuits have labelled similar court-imposed custodial no-contact orders as part of the defendant's criminal sentence. *See, e.g.*, *Santos Diaz*, 66 F.4th at 441 ("Whether a district court can impose a specific sentence, such as a no-contact order, is a legal issue and is reviewed de novo."); *United States v. Morris*, 259 F.3d 894, 897, 900 (7th Cir. 2001) (describing a district court's custodial no-contact order "as part of [the defendant's] sentence"). Although the district court here issued a standalone civil injunction imposing the no-contact terms, it included the no-contact order as part of the criminal judgment. Regardless, because we conclude the district court had no statutory or ancillary jurisdiction—civil or criminal—to issue the order, characterizing the order as a civil injunction does not cure the jurisdictional defect.

of their institution,' powers 'which cannot be dispensed with in a Court, because they are necessary to the exercise of all others.'" *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (quoting *United States v. Hudson*, 11 U.S. 32, 34 (1812) (alterations in original)).

This inherent authority is "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Id*. (quoting *Link v. Wabash R. Co.,* 370 U.S. 626, 630–31 (1962)). The Supreme Court has admonished, however, that these powers "ought to be exercised with great caution." *Id*. (quoting *Ex parte Burr*, 22 U.S. 529, 531 (1824)). An action taken under inherent authority must be a "'reasonable response to the problems and needs' confronting the court's fair administration of justice." *Dietz v. Bouldin*, 579 U.S. 40, 45 (2016) (quoting *Degen v. United States*, 517 U.S. 820, 823–24 (1996)).

The Supreme Court has "[n]ever found inherent authority to add terms and conditions to a criminal sentence." *Santos Diaz*, 66 F.4th at 444. Yet the Government asks us to uphold the no-contact order as part of the district court's inherent authority to ensure the "fair administration of justice (such as protecting a minor victim)." Appellee's Br. at 27. This approach was most notably established by the Ninth Circuit in *Wheeler v. United States*, 640 F.2d 1116, 1123 (9th Cir. 1981), and later adopted by the Seventh Circuit in *United States v. Morris*, 259 F.3d 894, 901 (7th Cir. 2001).

*a. Wheeler*

In *Wheeler*, the Ninth Circuit considered a no-contact order issued by a district court to protect a witness against a defendant who had threatened to call the witness's

26

family and employer to reveal discrediting information about her. 640 F.2d at 1118. The order also prohibited the defendant from contacting nine other individuals who were relatives or colleagues of the witness. *Id.* There, the witness had requested that the district court impose a no-contact order because the defendant had continued his harassment of her after the trial ended. *Id.* Although the no-contact order was imposed after trial, the Ninth Circuit concluded that, by protecting the witness after the trial had ended, the district court was "encouraging that witness, and other potential witnesses, to come forward and provide information helpful to the implementation of justice," thereby maintaining the independence of future witnesses. *Id.* at 1123. The Ninth Circuit reasoned that the no-contact order could be justified as based in the "trial court's inherent power to protect the sound administration of justice." *Id.* The Ninth Circuit did not ultimately hold that the no-contact order in that case was appropriate, instead remanding for further fact-finding and consideration by the district court, but the court's analysis concluded that a no-contact order might be appropriate in some circumstances "in light of . . . the court's inherent, but circumscribed, power to protect witnesses." *Id.* at 1126.

  b. *Morris*

Relying on the analysis in *Wheeler*, the Seventh Circuit held that a district court possesses inherent authority to impose no-contact orders "to protect the administration of justice." *Morris*, 259 F.3d at 901. The custodial no-contact order at issue in *Morris* applied to the defendant's victim and her family. *Id.* There, the defendant, who pleaded guilty to a sex act crime with a juvenile, had "persistently" contacted his victim indirectly

by relaying messages through friends to her. *Id.* While recognizing that the use of custodial no-contact orders "must be reserved for rare and compelling circumstances," the appellate court concluded that "such circumstances" were present. *Id.* There, the defendant was "endeavoring to withdraw his guilty plea, [rendering] a future trial [] possible," at which "the victim would be a most important witness for the prosecution." *Id.* Because one purpose of the no-contact order was to "reduce the possibility of creating a reluctant witness," the Seventh Circuit held the district court "properly exercised" its authority to "protect the administration of justice from abuses, oppression and injustice." *Id.* at 900–01 (quoting *Wheeler*, 640 F.2d at 1123 (internal quotation marks omitted)).

   *c.  Grigsby*

   As the Government notes, we have cited *Morris* favorably in an unpublished decision. *See United States v. Grigsby*, 737 F. App'x 375, 377 (10th Cir. 2018) ("*Grigsby I*") (unpublished); *see also United States v. Grigsby*, 854 F. App'x 249, 253 (10th Cir. 2021) ("*Grigsby II*") (unpublished) (noting that "we determined in *Grigsby I* that a standalone no-contact order is not part of the sentence" and "*Grigsby I* is the law of this case").[8] In *Grigsby I*, the defendant pleaded guilty to nine charges relating to the possession and production of child pornography, which included as a subject one of his biological children. 737 F. App'x at 376. The victim's mother requested a no-contact

---

   [8] We are not bound by our unpublished decisions in *Grigsby I* and *Grigsby II*. *See United States v. Ellis*, 23 F.4th 1228, 1238 n.6 (10th Cir. 2022) (noting that unpublished decisions are not binding).

order preventing the defendant from contacting his two children, including the victim. *Id.* The district court entered both a special condition of supervised release and a standalone order accompanying the defendant's prison sentence imposing the no-contact restrictions. *Id.* The defendant did not challenge the no-contact order on direct appeal but challenged the in-custody standalone order in a subsequent motion. *Id.* at 376–77.

To assess our jurisdiction to review the matter, this court had to decide whether the motion was a second or successive petition under § 2255, or a motion brought under Federal Rule of Civil Procedure 60(b), seeking relief from a civil judgment. *Id.* at 377. We held it was a 60(b) motion because "the district court's no-contact order is a civil injunction pursuant to its ancillary jurisdiction—not a part of [the defendant's] sentence that he must attack under § 2255." *Id.* In reaching that conclusion, we cited the Seventh Circuit's decision in *Morris. Id.* Importantly, nothing in our *Grigsby I* decision required us to opine on whether the district court erred in finding the circumstances there were "rare and compelling," *Morris*, 259 F.3d at 901, such that a no-contact order could be imposed pursuant to the court's ancillary authority.[9] *See Grigsby I*, 737 F. App'x at 377–78.

### d. *Santos Diaz*

More recently, the Third Circuit in *Santos Diaz* rejected the Seventh and Ninth Circuits' view of a court's inherent authority to impose a custodial no-contact order.

---

[9] We take no position on whether the circumstances in *Grigsby I* were rare and compelling such that imposition of a standalone no-contact order was proper.

66 F.4th at 444–47. During the defendant's period of supervised release in *Santos Diaz*, police officers responded to a domestic violence incident involving the defendant's then girlfriend.[10] *Id.* at 438–39. As a result, the magistrate judge imposed a no-contact condition that restricted the defendant's ability to have contact with his girlfriend pending a final revocation hearing before the district court. *Id.* at 439. Mere hours after this hearing, the defendant violated the no-contact condition by calling his girlfriend and entreating her to falsely testify at the next hearing and destroy evidence connected to the domestic abuse incident. *Id.* at 440. Upon revocation of the defendant's supervised release, the district court imposed a no-contact order between the defendant and his girlfriend spanning his two-year incarceration period and supervised release term. *Id.* at 441. The district court justified the order on the basis that it had found no alternative that could have achieved the goal of deterrence given the defendant's history of repeatedly violating the conditions of his supervised release. *Id.*

The Third Circuit vacated the custodial no-contact order, reasoning that allowing "a court to change a defendant's terms of incarceration under the guise of inherent authority" would allow district courts to "explicitly defy a rule, statute, or constitutional provision." *Id.* at 447 (quotation marks omitted). It concluded that "courts cannot impose punishment not authorized by statute" and "the logic espoused by *Wheeler* and *Morris*

---

[10] At some point between the district court's imposition of the custodial no-contact order and the Third Circuit's review of the appeal, the defendant's girlfriend became his fiancée. *See Santos Diaz*, 66 F.4th at 438–39.

. . . could allow a court to do just that, serving as an unfettered source of a power." *Id.* at 446 n.6.

### e. *Application*

We do not decide here whether there may be a situation where a district court may exercise inherent authority to impose a custodial no-contact order post-trial. We simply hold that, to the extent that such authority exists, it must be limited to "rare and compelling circumstances." *Morris*, 259 F.3d at 901. Moreover, such authority should be exercised with caution to avoid the unfettered defiance of rules and statutes portended in *Santos Diaz*, 66 F.4th at 447. Absent such rare and compelling circumstances, inherent authority should not be used to justify corrective measures imposed after trial. *See id.* at 446.

There are no such rare and compelling circumstances here. Unlike in *Morris*, there is no possibility of past witnesses or victims being called to testify in a retrial. The Seventh Circuit upheld the no-contact order there because the defendant's motion to withdraw his guilty plea effectively moved the case into a pre-trial posture, and the minor victim he was harassing would be crucial to "a future trial." 259 F.3d at 901. Here, the proceedings are complete and there is no possibility of a future trial. *Id.* Accordingly, there is no risk of Mr. Honors unduly persuading B.J. or her family members to become a "reluctant witness" because there is no chance of a future trial where any of them could be called to testify. *Id.*

Moreover, unlike in the cases relied on by the Government, this no-contact order was not imposed at the request of a witness or other affected individual. By contrast, in *Wheeler,* a witness requested the no-contact order after the defendant made several attempts to provide disparaging information to the witness's family and employer and continued this harassment after the trial was over. 640 F.2d at 1123. And in *Grigsby I,* the no-contact order was requested by the victim's mother, who asked the court to prohibit contact with two of the defendant's children, one of whom was a victim of the defendant. 737 F. App'x at 376. In this case, neither B.J. nor her family requested the order.

In sum, the logic of "protect[ing] the administration of justice from abuses, oppression and injustice" is not present here. *Wheeler*, 640 F.2d at 1123 (internal quotation marks omitted). Even accepting there may be circumstances that justify a district court's exercise of inherent authority to impose a post-trial no-contact order, no such "rare and compelling" circumstances are present here. *Morris*, 259 F.3d at 901; *see also Wheeler*, 640 F.2d at 1124 n.15 ("[P]ost-trial orders to protect witnesses are extraordinary in character and to be issued only in rare instances.").

Thus, the district court lacked statutory jurisdiction to modify the terms of Mr. Honors's imprisonment after announcing his sentence, and no ancillary jurisdiction cures this jurisdictional defect under these facts. We vacate the no-contact order as applied to all individuals.[11]

---

[11] Although Mr. Honors challenges the custodial no-contact order only as applied to his wife and biological children, we also vacate the order as applied to B.J.

32

### C. Special Condition of Supervised Release

Mr. Honors asserts that the no-contact special condition on his ten-year term of supervised release, as applied to his wife and four biological children, is a "greater deprivation of liberty than necessary, because it infringes on [his] right to familial association without a compelling justification," in violation of 18 U.S.C. § 3583(d). Appellant's Br. at 44. Because Mr. Honors objected to the no-contact condition of supervised release "at the time it [was] announced, this [c]ourt reviews for abuse of discretion." *United States v. Bear*, 769 F.3d 1221, 1226 (10th Cir. 2014) (quotation marks omitted).

A district judge may impose a special condition of supervised release where the condition meets three elements. *See* 18 U.S.C. § 3583(d). First, the condition must be "reasonably related to the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), and (a)(2)(D)." *Id.* Second, the condition must not "involve[ ] . . . greater deprivation of liberty than is reasonably necessary for the purposes set forth in section 3553(a)(2)(B), (a)(2)(C), and (a)(2)(D)." *Id.* Lastly, any condition must be "consistent with any pertinent policy statements issued by the Sentencing Commission pursuant to 28 U.S.C. 994(a)." *Id.*

A defendant has a fundamental right to familial association. *See United States v. Lonjose*, 663 F.3d 1292, 1303 (10th Cir. 2011). This is true whether he is in custody or

---

because the district court did not have statutory or ancillary jurisdiction to impose the order.

not. *See Turner v. Safley*, 482 U.S. 78, 84 (1987) ("Prison walls do not form a barrier separating prison inmates from the protections of the Constitution."). Indeed, "[t]he interest of parents in the care, custody, and control of their children[ ] is perhaps the oldest of the fundamental liberty interests recognized by" the Supreme Court. *Troxel v. Granville*, 530 U.S. 57, 65–66 (2000). Based on the Due Process Clause of the Fourteenth Amendment, *Hollingsworth v. Hill*, 110 F.3d 733, 739 (10th Cir. 1997), "a father has a fundamental liberty interest in maintaining his familial relationship with his [children]," *United States v. Edgin*, 92 F.3d 1044, 1049 (10th Cir. 1996). *See also Hollingsworth*, 110 F.3d at 738 (stating that a parent "[u]ndoubtedly" has the right to assert constitutional rights "on behalf of their children" (emphasis omitted)). And this fundamental right to familial association also includes spouses. *See Griffin v. Strong*, 983 F.2d 1544, 1548 (10th Cir. 1993); *United States v. Astorga*, No. 21-2026, 2022 WL 17826058, at *5 (10th Cir. Dec. 21, 2022) (unpublished).

A "special condition[] that interfere[s] with the right of familial association can do so only in compelling circumstances," *United States v. Smith*, 606 F.3d 1270, 1284 (10th Cir. 2010), and must "be especially fine-tuned to achieve the statutory purposes of sentencing," *United States v. White*, 782 F.3d 1118, 1138 (10th Cir. 2015) (quotation marks omitted). Thus, when a special condition of supervised release limits a defendant's contact with his children, "the record [must] unambiguously support a finding that [the defendant] is a danger to his own child[ren]." *Smith*, 606 F.3d at 1284; *see also White*,

34

782 F.3d at 1141 ("If a parent-like right is impacted, the conditions must be supported by express findings of compelling circumstances.").

The district court reasoned that the no-contact special condition of supervised release was justified because: the court was "skeptical" Mr. Honors's children would want to contact him; he is not a "good dad" in light of his crimes; he tried to obstruct justice with the letters he wrote to his wife while in custody pre-sentencing; and his actions were particularly "horrific." ROA Vol. III at 749, 754. The Government also argues the order averts child abuse.

To be sure, after a person has been convicted of a sex offense against a minor, courts do not automatically divest those individuals of their fundamental rights to familial association with their own minor children. *See, e.g.*, *United States v. Cabrera-Rivera*, 893 F.3d 14, 33 (1st Cir. 2018); *United States v. Quinn*, 698 F.3d 651, 652 (7th Cir. 2012); *United States v. Davis*, 452 F.3d 991, 995 (8th Cir. 2006). Instead, courts require additional facts justifying restrictions on communication with those specific family members. *See, e.g.*, *Davis*, 452 F.3d at 995 (explaining any condition that would interfere with the parent-child relationship must be justified on an individualized basis, not on a categorical basis of the crime committed); *United States v. Widmer*, 785 F.3d 200, 208 (6th Cir. 2015) (discussing the specific facts justifying the district court's imposition of a restriction on the defendant's association with his minor child).

But the no-contact special condition, as challenged by Mr. Honors, cannot be justified as protecting minors because it will affect no minor children. Mr. Honors's

35

period of supervised release will not begin until after he completes his sixty-year term of incarceration—well after his children reach the age of majority. There is no evidence, nor did the district court find, that Mr. Honors will seek to sexually exploit his adult, biological children if he lives long enough to be released from prison. Moreover, the Government has made no argument that Mr. Honors will be a danger to his adult children or spouse after he is released. Thus, there are no compelling circumstances that justify imposition of the special condition. "[I]n addition to having a weak temporal connection with [Mr. Honors's] sex offense[s]," the condition, as a decade-long sweeping prohibition on communicating with his children and wife after his release from prison, "is very broad," *United States v. Fey*, 834 F.3d 1, 5 (1st Cir. 2016).

The prohibition on Mr. Honors's contact with his spouse and with his biological children, who will be adults when the condition becomes effective, unduly constrains his constitutional rights to familial affiliation without justification grounded in the record. *See Cabrera-Rivera*, 893 F.3d at 32–33. The district court thus abused its discretion by imposing this condition, as applied to Mr. Honors's biological children and spouse, on Mr. Honors's supervised release.

### III.     CONCLUSION

We AFFIRM Mr. Honors's convictions, VACATE the custodial no-contact order as applied to B.J. and her family, and VACATE the special condition on Mr. Honors's supervised release as applied to his biological children and spouse.

36